UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 3:21-CR-90 JD |
| LEONTIS CORNELIUS | |

**OPINION AND ORDER**

Defendant Leontis Cornelius was charged in a two-count superseding indictment with possessing a firearm after being convicted of a felony. The charges arose out of an incident in the wee hours of the night when a police officer responding to an emergency call found him carrying a rifle. Mr. Cornelius was detained after which he made various statements which he now wants excluded from admission at trial because he wasn't advised of the *Miranda* rights. To this end, he filed a motion to suppress, which the Court will grant in part and deny in part.

**A. Factual Background**

The following facts taken from the Government's response to Mr. Cornelius's motion to suppress are uncontested.[1]

South Bend police officers responded to a 911 call on Huey Street regarding a domestic disturbance around 2 am on June 27, 2021. A 911 caller reported that a man had a gun to a boy's head. Officer Garrett Payne arrived first and encountered Mr. Cornelius. As Mr. Cornelius was emerging from behind the house, Officer Payne asked, "What's going on?" (Gov't Ex. 1 at 1:03) and then immediately shouted, "Hey drop it, drop it, drop it," referring to a rifle held by Mr.

---

[1] The facts are derived from the police officers' body cameras which the Government has introduced as Exhibits 1–5 (DE 22).

Cornelius. Mr. Cornelius answered, "I've got a license." (*Id*. at 1:10.) The video is too dark to see what Mr. Cornelius was holding, but a rifle was later recovered from the location where Mr. Cornelius was standing.

Next, Officer Payne approached Mr. Cornelius, told him to turn around, and asked if he had any other guns on him. He then asked Mr. Cornelius who else was in the house, to which Mr. Cornelius answered, "Nobody." (*Id*. at 1:25.) Officer Payne then said, "I just gotta figure out what's going on ok? You live here man?" Mr. Cornelius answered, "No I don't. I live around the corner." At this point, Officer Payne handcuffed Mr. Cornelius. (*Id*. at 1:38.) Officer Payne then asked, "Who else is inside?" to which Mr. Cornelius answered, "This is a child dispute." At this point, Officer Payne instructed Mr. Cornelius to sit on the front lawn, but Mr. Cornelius refused. Officer Payne asked, "Are there any guns in the house?" and Mr. Cornelius said, "No guns in the house." (*Id*. at 2:06.) Officer Payne asked who lived there and answered, "The parents of the child. It is nothing I promise you. Y'all good." (*Id*. at 2:18.)

At this moment, another man approached Officer Payne, and Officer Payne left Mr. Cornelius to talk to the man. Suddenly, there was yelling and shouting in the distance and the scene quickly became chaotic. (*Id*. at 2:45.) Officer Payne attempted to maintain control of the scene. A woman emerged yelling threats and Officer Payne approached in an attempt to settle her down. The woman was yelling at another woman who can be heard in the background. Officer Payne repeatedly asked the woman to stop, but she kept yelling, "I'm gonna kill you, b****." (*Id.* at 4:10-5:02.) Officer Payne then placed her in the back of a squad car in handcuffs.

At around the five-minute mark, Officer Payne is heard debriefing Sgt. Paul Daley. Among other things, he told Sgt. Daley that "they're saying someone's being held hostage in here, I don't know what's going on." (*Id.* at 5:35.) Over the next ten minutes, Officer Payne

continued to help with taking control of the scene. He also interviewed witnesses in an attempt to find out why the police were called.

Within a minute of Officer Payne leaving Mr. Cornelius, Officer Tyler Donlon, who was wearing a body camera, also came to the scene and approached Mr. Cornelius, who was standing on the sidewalk. Mr. Cornelius yelled that it was all good and the two briefly discussed the chaos around them. Officer Donlon asked Mr. Cornelius for his name and Mr. Cornelius gave it. In the background there can be heard multiple voices screaming, including a woman yelling: "You gonna get it!" (Gov't Ex. 2 at 4:24.) Officer Donlon continued to stand next to Mr. Cornelius and commented to him that the yelling woman would be taken to jail in thirty seconds. Mr. Cornelius asked for a chance to calm her down but Officer Donlon said that he didn't know what was going on. At this time, Officer Shawn Fredenburg is heard clearing the ammunition from the rifle dropped by Mr. Cornelius, to which Mr. Cornelius says: "Ain't nothing in that. Ain't nothing in that. That's $40 a round. Don't do that. That's $40 a round. I'm sorry. License." Officer Donlon asked, "You have one?" and Mr. Cornelius answered, "Yes I do. That's $40 a round." (*Id*. at 5:20–5:38; Gov't Ex. 3 at 40–41.) Mr. Cornelius then said he would listen to every command that Officer Donlon issued.

Next, Officer Donlon asked Mr. Cornelius for his name, date of birth, and where he lived. (Gov't Ex. 2 at 5:45–7:01.) Officer Donlon asked what brought Mr. Cornelius to this location, and Mr. Cornelius asked if he could take his cuffs off, promising he wouldn't go anywhere. Officer Donlon then responds: "Here's my thing. You know, we get called out here because there's individuals pointing guns at people. OK? So one of my officers pulls up and sees you with the rifle in your hand, am I correct?" to which Mr. Cornelius responds: "True." Officer Donlon then continued: "So right now, until we get everything straightened out, you're just

3

going to stay in those until we get everything figured out." (*Id*. at 7:01-7:25.) Officer Donlon asked again why Mr. Cornelius came to the house, and Mr. Cornelius responded that his little brother called and said a dude got a gun with a thirty-round clip. Officer Donlon asked why Mr. Cornelius's brother was there, and Mr. Cornelius answered that his brother was there to get his stepdaughter from the house. Officer Donlon asked whether bringing a gun to the house was the smartest thing to do, and Mr. Cornelius answered that the man came up to his truck and said he'd kill everybody in the truck. Officer Donlon then asked Mr. Cornelius if he can identify the man who made the threat, and Mr. Cornelius points him out as the guy who just "walked in the back over there." Mr. Cornelius said that the man respects "force on force." Officer Donlon clarified the details by asking whether Mr. Cornelius's brother arrived before or after Mr. Cornelius. Mr. Cornelius answered that his brother had not been there before, so Officer Donlon asked how the brother knew that this guy had a gun. Mr. Cornelius answered: "Truth be told, he beats the s*** out of the female." Officer Donlon asked if Mr. Cornelius could point out the guy who beat the woman, and asked who the women standing outside were, including the woman who was screaming and yelling. (*Id.* at 7:25- 9:52.) By now, the screaming and shouting around the officers had ceased, but the people involved still appeared to be on the scene.

      Around this time, Mr. Cornelius told Officer Donlon "Ain't nobody [inaudible] to nobody, " and Officer Donlon answered: "We don't know that. You were standing out here with a rifle." Mr. Cornelius said: "Hold up. Y'all pulled up to a house that I'm at with a rifle and y'all got handguns … and I set my gun down." (*Id*. at 10:00–10:42.) Mr. Cornelius a little later said he got "it" out of the truck because a man pulled out a gun with a 30-round clip on it. (*Id*. at 11:15–11:25.)

4

As this conversation was happening, Sgt. Daley walked by the two men, and Mr. Cornelius exclaimed to Sgt. Daley: "Whoa, whoa, whoa, don't I know you from somewhere?" (*Id.* at 11:27.) Sergeant Daley asked for his name, and Mr. Cornelius told him it's Leo Cornelius. Sgt. Daley then responded: "Oh yeah, your house is up here on the left," to which Mr. Cornelius answered, "Yes it is." Sgt. Daley then said: "You shot up that guy," and Mr. Cornelius said, "Who shot up my house." Then Sergeant Daley said, "And Sheldon took your gun because you're a federally convicted felon," to which Mr. Cornelius answered, "No, I'm not." Sgt. Daley continued, "Yes you are. We know you are." At this time Officer Donlon interjected, "That makes that even more of a problem," to which Mr. Cornelius responded, "So that makes it more of a problem?" Officer Donlon answered: "Yes," and Mr. Cornelius said: "How much you wanna bet I have it back in the morning?" (*Id.* at 11:25–11:57.) Sgt. Daley then asked Officer Donlon if Mr. Cornelius had a gun, and Officer Donlon answers he didn't see Mr. Cornelius with a gun, and that Mr. Cornelius was cuffed when he got there. Sgt. Daley then told Mr. Cornelius that he was going to get this figured out and get him out of there. He then told Mr. Cornelius to go to the squad car and wait for him because somebody was out on the street videotaping them. (Gov't Ex. 4, at 7:00–8:10.) At this point, Sgt. Daley left Mr. Cornelius and Officer Donlon. He walked back to the house to ask a woman if she's checked on everybody inside. He then asked an officer who was standing outside the house if he could figure out who the complainant was and find him. Sgt. Daley then walked away from the house saying, "I'm putting it together." (*Id.* at 8:10–8:49.) In total, Mr. Cornelius stood with Officer Donlon for about eleven minutes on the sidewalk.

After Sgt. Daley left them, Mr. Cornelius was placed in a squad car where an officer was talking to him with the door open. Officer Donlon removed Mr. Cornelius's handcuffs. He again

asked Mr. Cornelius why the police were called. Mr. Cornelius answered that his brother came to his house, somebody threatened to kill the baby, and he repeated that the guy had a 30-round clip and "we gotta equalize." (Gov't Ex. 2 at 16:50-17:52.) Mr. Cornelius said there was a conversation, with no shots fired and he was walking away when police arrived. (*Id*. at 17:52–18:20.)

      About six minutes after Mr. Cornelius was placed in the squad car, he was handcuffed again and told that he'd be taken to the police station to talk to an ATF agent. As they were driving, Officer Donlon told Mr. Cornelius that this is a "detainment" as opposed to an arrest. (*Id*. at 23:40–23:51.) Mr. Cornelius argued that he was being arrested, and told the officer that he must mirandize him before removing him from the scene. (*Id*. at 23:51–27:21.) Mr. Cornelius told Officer Donlon that the police could have just asked him to come down to the station on his own, and he would have come, instead of being driven in the squad car. (*Id*. at 28:00–28:41.)

      At the station, ATF Task Force Officer Brandon Stec attempted to interview Mr. Cornelius. He advised Mr. Cornelius of his Miranda rights and conducted a short interview during which Cornelius denied possessing the gun.

      After the ATF interview, Mr. Cornelius spoke with an officer at the threshold to the interview room. He was not handcuffed. Mr. Cornelius reiterated that a man was going to shoot a baby and he pulled up to the house in his truck, his wife had a gun in the truck, he pulled up, "it was what it was," and that was it. (Gov't Ex. 5 at 00:30–1:25.) He asked the officers how many firearms they retrieved from the scene. Sergeant Daley told him that they retrieved Mr. Cornelius's firearm from the scene. Mr. Cornelius then said that there were six firearms at the scene. (*Id.* at 2:20–2:45.)

6

B. **Discussion**

**(1) *Miranda* Rights**

The Fifth Amendment to the United States Constitution protects individuals from self-incrimination. US. Const. amend. V ("No person . . . shall be compelled in any criminal case to be a witness against himself . . . .") In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court of the United States held that custodial interrogation may undermine the defendant's right against self-incrimination and instituted safeguards before such interrogations may begin. Namely, "[p]rior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444. If the defendant was a subject of custodial interrogation and was not informed of his Constitutional rights, his statements must be excluded from trial, unless certain exceptions apply. Although the defendant must show that he was subject to custodial interrogation, *see United States v. Patterson*, 826 F.3d 450, 455 (7th Cir. 2016) ("For [the defendant] to establish he was in custody at the time of his incriminating statements, he 'must show that he . . . was formally arrested, or that he . . . was subjected to restraints of freedom such that the conditions of a formal arrest were closely approximated or actually attained."), "the burden of showing admissibility rests, of course, on the prosecution," *Brown v. Illinois*, 422 U.S. 590, 604 (1975).

Mr. Cornelius asserts that from the moment Officer Payne trained his gun on him, he was in police custody and his subsequent statements to the officers, as well as any information gained as a result, must be suppressed because the officers did not advise him of his *Miranda* rights. (Def.'s Mot. Suppress, DE 19 at 1–2, 4–5.) The Government resists this characterization, arguing that Mr. Cornelius was not in custody when he made the incriminating statements at the Huey

Street location and his statements weren't the product of police interrogation but were volunteered instead.[2] In the alternative, the Government argues that Mr. Cornelius's statements are admissible under the public safety exception to *Miranda*.

**(2) *Custody***

Two separate inquiries are critical to determining whether a person is in custody for Miranda purposes: "(1) what were the circumstances surrounding the interrogation; and (2) would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave." *J.D.B. v. North Carolina*, 564 U.S. 261, 270 (2011). As for the circumstances surrounding the interrogation, the Seventh Circuit has identified a number of factors that are indicative of custody, including where the encounter occurred, if the suspect consented to speak with officers, if the suspect was moved to another area, if there was a threatening presence of several officers and a display of weapons or physical force, and the officers' tone of voice. *United States v. Ambrose*, 668 F.3d 943, 956 (7th Cir. 2012). The second inquiry is an objective analysis that does not take subjective views of either the suspect or the law enforcement officers into consideration. "In determining whether a person is in custody in this sense, the initial step is to ascertain whether, in light of the objective circumstances of the interrogation, a reasonable person [would] have felt that he or she was not at liberty to terminate the interrogation and leave." *Howes v. Fields*, 565 U.S. 499, 509 (2012) (quotation omitted). Courts must look at the totality of circumstances on an objective basis and whether a reasonable person under the

---

[2] In its response to Mr. Cornelius's motion to suppress, the Government discusses only the time period between Mr. Cornelius's initial seizure and the moment when he was driven away to the police station. It does not contest Mr. Cornelius's argument that his statements to Sgt. Daley at the police station should be suppressed.

circumstances would have believed he was in custody. *United States v. Thompson*, 496 F.3d 807, 810 (7th Cir. 2007).

The government maintains that Mr. Cornelius was not in custody when Officer Payne first encountered him and when he told Officer Payne, "I've got a license." According to the Government, neither was Mr. Cornelius in custody when Officer Donlon was speaking to him on the sidewalk. Rather, he was detained akin to a *Terry* stop while the officers were trying to gain control of a volatile situation. *Cf. United States v. Grogg*, 534 F.3d 807, 810 (7th Cir. 2008) ("Police are permitted . . . to make investigatory stops limited in scope and executed through the least restrictive means reasonable, referred to as *Terry* stops.") (citing *Terry v. Ohio*, 392 U.S. 1 (1968)), but the Government makes no effort to explain its generic assertion.

The Court agrees with Mr. Cornelius that he was in custody from the moment Officer Payne drew his gun ordering him to drop the weapon until he was taken away in the squad car. "A person is in custody for purposes of *Miranda* if that person is either formally arrested or has suffered a 'restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Burns*, 37 F.3d 276, 280 (7th Cir. 1994) (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). Curiously, the Government ignores the fact that, during the initial encounter, Officer Payne was pointing a gun at Mr. Cornelius and claims that he was not then in custody for the purpose of *Miranda* jurisprudence because he was not handcuffed or otherwise restrained. (Gov't Resp., DE 21 at 12.) The Government does not present a single point of authority to support its position. In fact, the opposite is true, especially because Officer Payne handcuffed Mr. Cornelius immediately after he drew his gun. A reasonable person would feel his freedom of movement restrained as soon as a police officer issued orders to that person while pointing a firearm in his direction. When Officer Payne yelled "drop it" with a gun pointed at him, Mr.

9

Cornelius, like any other reasonable person, complied, dropping the rifle and placing his hands behind his back for handcuffing. In that sense, the drawing of the firearm and the handcuffing are really a single event because only seconds, not minutes, elapsed from the time Officer Payne pointed the gun at Mr. Cornelius, ordering him to drop the rifle, and secured him in handcuffs. *See United States v. Seymour*, No. 2:17CR138-PPS, 2021 WL 389411, at *5 (N.D. Ind. Feb. 4, 2021) (observing that, because handcuffs represent a level of restraint on freedom of movement associated with a formal arrest, the defendant was likely in custody during a brief period he was handcuffed even though his handcuffs were later removed); *see also Lopez v. Grams*, No. 08-CV-408-BBC, 2009 WL 5092866, at *14 (W.D. Wis. Dec. 16, 2009) (finding that the defendant was in custody after an officer found him lying in the grass, drew his firearm, handcuffed, and placed him in the back of the squad car, even though the officer testified he was not in custody at that time, because a reasonable person in defendant's position would have believed that he was not free to leave). In any case, the Court does not need to identify the precise second when Mr. Cornelius was placed in custody as his statement—"I've got a license"—was not the product of interrogation as explained below.

In addition, for the rest of his time at the scene, Mr. Cornelius stayed in handcuffs except when they were briefly removed after he was placed in the squad car. At one point, Mr. Cornelius asked for the handcuffs to be removed, promising not to run, but his requests were rejected. He was told to stay on the sidewalk which he protested but, again, his protests were ignored. Additionally, there were multiple officers present, a further indication that Mr. Cornelius had no choice but to comply with their orders. And when the officers confirmed that he had a previous felony conviction, he was removed from the sidewalk and taken to the squad car. While sitting in the car, he again requested that his handcuffs be removed promising not to

run. This time, Officer Dolton removed his handcuffs briefly, but remained in front of Mr. Cornelius. Shortly after that, Mr. Cornelius was re-handcuffed and taken away to the police station, without a chance to go on his way. All these factors establish that Mr. Cornelius was in police custody as no reasonable person under the circumstances would have felt that he was at liberty to leave.

Moreover, although the Government likens Mr. Cornelius's case to *United States v. Leal*, 1 F.4th 545 (7th Cir. 2021), and *United States v. Wyatt*, 179 F.3d 532 (7th Cir. 1999), they are inapposite. In *Leal*, the agents' interview of the defendant did not rise to the level of a custodial interrogation because "the agents did not use physical restraint, brandish their weapons, or flaunt a threatening presence such that their requests were likely to be obeyed. They simply stopped [the defendant] and interviewed him with his consent." *Id*. at 552 (quotation marks and citation omitted). Similarly, in *Wyatt*, another case where the court of appeals found no custodial interrogation, the investigators' intrusion upon the defendant was also minimal. The defendant was suspected of a robbery and two officers tracked him down to a bar where they asked him "and did not demand" that he "accompany them out of the bar, and [the defendant] agreed." *Wyatt,* 179 F.3d at 536. There was no evidence "that the officers physically compelled [the defendant] to follow them out of the bar" or that his exit was involuntary. *Id*. One of the officers "stood approximately three feet from [the defendant] during the interview, and . . . there is no record evidence that [the defendant's] freedom of movement was otherwise impaired." *Id*. Importantly, "[n]o guns or other weapons were drawn at any point, and there is otherwise no record evidence of a show of force or authority." *Id*. (quotation marks and citation omitted). "Nor did they handcuff him. At the conclusion of the interview, the [] officers asked if [the defendant] would accompany them to the police station, and conveyed him there in a squad car uncuffed

11

and only after he agreed to go." *Id*. at 537. These cases do not remotely resemble Mr. Cornelius's experience and do nothing to dispel the fact that Mr. Cornelius was "deprived of his freedom of action in [a] significant way . . . ." *See Berkemer v. McCarty*, 468 U.S. 420, 435 (1984).

Now a word on the Government's suggestion that Mr. Cornelius's seizure was "akin" to a *Terry* stop and therefore could not be a custodial seizure. "In considering whether a suspect is in custody for purposes of *Miranda*, courts have often consulted the line of Fourth Amendment cases, beginning with *Terry v. Ohio*, discussing whether certain seizures are 'reasonable' absent probable cause. For instance, in *Berkemer*, the Supreme Court addressed the issue of "whether the road-side questioning of a motorist detained pursuant to a routine traffic stop should be considered 'custodial interrogation.'" *United States v. Burns*, 37 F.3d 276, 280 (7th Cir. 1994). In fact, *Berkemer* notes that "[t]he comparatively nonthreatening character of [*Terry* stops] explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda*." *Berkemer*, 468 U.S. 440. Following *Berkemer*, the Seventh Circuit has even held that *Miranda* warnings are not required where a suspect has been detained pursuant to a *Terry* investigatory stop. *See United States v. Boden*, 854 F.2d 983, 995 (7th Cir. 1988). What is more, in *United States v. Patterson*, 826 F.3d 450, 457 (7th Cir. 2016), the Seventh Circuit has stated that "[a] *Terry* stop does not constitute custody for Miranda purposes."

Yet even if the Government is correct in its generic assertion that Mr. Cornelius's detention was effectively a *Terry* stop, it has not attempted to back up its claim with any argument, and the Court declines to do the Government's work. In other words, the Government has not shown that Mr. Cornelius's detention was "akin" to a *Terry* stop as opposed to a custodial arrest. "Undeveloped arguments are considered waived." *United States v. Stadfeld*, 689 F.3d 705, 712 (7th Cir. 2012). Furthermore, the cases which observe the correlation between a

12

*Terry* stop and the absence of custody all deal with noncoercive fact patterns. *See, e.g., Maryland v. Shatzer*, 559 U.S. 98, 113 (2010) ("Thus, the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute Miranda custody.") (citation omitted); *Berkemer*, 468 U.S. at 440 ("The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda."); *Burns*, 37 F.3d at 281 ("Most detentions that occur during the execution of a search warrant, like most Terry stops, are 'comparatively nonthreatening.'"). On the other hand, when examining the interplay between *Terry* and *Miranda* in a case where police officers drew their guns and handcuffed the defendant, the Seventh Circuit has held with "no difficulty" that, even if there was a valid *Terry* stop, when the defendant was placed in handcuffs and told to sit at a specific place on the grass by the side of the road, and was outnumbered by police officers and not free to go anywhere, for the purposes of *Miranda*, it was "as if he were handcuffed to a chair in a detective's office or placed in a holding pen in a station house or put behind bars." *United States v. Smith*, 3 F.3d 1088, 1097 (7th Cir. 1993). In other words, the defendant's freedom of action was curtailed to the point that he could not be questioned without *Miranda* warnings. *Id.; see also United States v. Perdue*, 8 F.3d 1455, 1464 (10th Cir. 1993) (holding that *Miranda* warnings were required during a *Terry* stop when police questioned a suspect after drawing their weapons, forced the suspect out of his car, directed him to lie face down on the ground, and placed handcuffs on him); *United States v. Elias*, 832 F.2d 24, 26 (3d Cir. 1987) (holding that *Miranda* warnings are required during a *Terry* stop if the suspect is in custody for practical purposes or the questioning takes place in a police dominated or coercive atmosphere); *United States v. Clemons*, 201 F. Supp. 2d 142, 144 (D.D.C. 2002) (in the context of the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and

13

other measures of force more traditionally associated with the concept of custody than with brief investigatory detention, seizures without probable cause may still be permissible for Fourth Amendment purposes, while at the same time creating a "custodial situation" under *Miranda* because a reasonable person so detained would feel that he has been deprived of his freedom of action in a significant way). For the reasons explained above, the Court finds that, even if Mr. Cornelius's detention amounted to a *Terry* stop, a reasonable person in his position would have nevertheless believed that he was under arrest, that is, in custody for the purpose of *Miranda* warnings. *See Burns*, 37 F.3d 276, 280 ("A person is in custody for purposes of *Miranda* if that person is either formally arrested or has suffered a 'restraint on freedom of movement' of the degree associated with a formal arrest.'"). But that's not the end of the *Miranda* analysis. Instead, the Court next must determine if Mr. Cornelius's statements were made in response to interrogation or otherwise permitted under the public safety exception.

### (3) *Interrogation*

"[T]he Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 300–01 (1980). "A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers

that they *should have known* were reasonably likely to elicit an incriminating response." *Id.* at 301–02. Under the Seventh Circuit's interpretation of *Innis*, "the test is whether a reasonable objective observer would have believed that the law enforcement officer's statements to the defendant were reasonably likely to elicit an incriminating response." *United States v. Hendrix*, 509 F.3d 362, 374 (7th Cir. 2007). "If the accused makes a statement in response to some words or actions by the police that do not constitute interrogation, or if the accused himself initiates further communications, the police are not prohibited from 'merely listening' to his voluntary statement. Volunteered statements of any kind are not barred by the Fifth Amendment." *United States v. Briggs*, 273 F.3d 737, 740 (7th Cir. 2001) (quotation marks and citations omitted). "Statements are volunteered when they are not the result of 'compelling influences, psychological ploys, or direct questioning.'" *United States v. Hendrix*, 509 F.3d 362, 374 (7th Cir. 2007) (citing *Arizona v. Mauro*, 481 U.S. 520, 529 (1987)). On the other hand, "merely reciting the evidence against a suspect is not the functional equivalent of an interrogation." *United States v. Johnson*, 680 F.3d 966, 977 (7th Cir. 2012) (collecting cases) (overruled on other grounds by *Fowler v. Butts*, 829 F.3d 788 (7th Cir. 2016)).

Here, Mr. Cornelius specifically challenges his statements to Officer Payne after he was ordered to drop the firearm ("I've got license.") and the statement to Sgt. Daley after he engaged him in conversation as he was passing by (the statement implicitly acknowledges that Mr. Cornelius "shot up that guy."). He also claims that he wants to exclude "any and all statements made to law enforcement that were obtained in violation of *Miranda v. Arizona*" (Def. Mot. Suppress, DE 24 at 2), but he does not discuss them in any detail in either his brief in support of the motion or the reply brief.

15

The Court finds that neither statement was the product of interrogation. When Officer Payne arrived at Huey Street, he almost immediately encountered Mr. Cornelius. Officer Payne shouted, "What's going on," and upon seeing the firearm, he immediately ordered that Mr. Cornelius drop it. Mr. Cornelius responded with "I've got a license," and dropped the gun. Nothing that Officer Payne said was interrogation; rather, Mr. Cornelius volunteered his statement. No reasonable objective observer would have believed that Officer Payne's general inquiry "What's going on?" and immediate order to Mr. Cornelius to drop the weapon were reasonably likely to elicit an incriminating response. Similarly, it cannot be said that Officer Payne should have known that his question and command would cause Mr. Cornelius to incriminate himself.

The same is true of Mr. Cornelius stating that each round loaded in the rifle cost $40 when he saw Officer Fredenburg clearing the rifle. The rifle was cleared to secure it and no one asked Mr. Cornelius any questions about it. At the time, Officer Dolton was trying to ascertain Mr. Cornelius's identity and they were discussing the chaos around them with Mr. Cornelius asking for a chance to calm down a screaming woman. Mr. Cornelius's statement about the cost of the shell and mentioning again of "license" cannot be said to be "the result of 'compelling influences, psychological ploys, or direct questioning.'" *Hendrix*, 509 F.3d at 374.

Likewise, Mr. Cornelius initiated the conversation with Sgt. Daley, who—after Mr. Cornelius identified himself—recognized him and noted that Mr. Cornelius lived close by and was the guy who "shot up that guy," to which Mr. Cornelius responded, "who shot up my house." And when Sgt. Daley said that Mr. Cornelius was a felon, Mr. Cornelius responded with the assurance that he will have the gun back in the morning. Mr. Cornelius volunteered these statements as Sgt. Daley was not engaged in either express questioning or its functional

equivalent. *Cf. United States v. Jones*, 600 F.3d 847, 855 (7th Cir. 2010) (*Miranda* warnings not required when defendant asked to speak to detective).

Next, Officer Donlon's statement to Mr. Cornelius that another officer saw him with a rifle, to which Mr. Cornelius said "true," was not an interrogation. This was a statement of evidence against Mr. Cornelius, which is not "the functional equivalent of an interrogation." *Johnson*, 680 F.3d at 977 (7th Cir. 2012) ("By reading the warrant aloud, [the officer] informed [the defendant] of the items officers had probable cause to search for in his apartment, essentially advising Johnson of potentially incriminating evidence that could be used against him. Johnson then made a voluntary statement in response.") (overruled on other grounds by *Fowler*, 829 F.3d 788).

Finally, there was no interrogation when the officers were conducting general on-the-scene questioning about Mr. Cornelius's identity, birthdate, his place of residence and alike. *See United States v. Paxton*, 848 F.3d 803, 813 (7th Cir. 2017) ("Although the defendants had not yet been given their *Miranda* warnings when they were asked these biographical questions, we do not think there was any Fifth Amendment violation, given that the sorts of questions posed (soliciting, e.g., their names, birth dates and/or ages, and places of residence)—the same sorts of questions that would be posed in booking any arrested individual—are not the sort of questions that one would expect to yield incriminating information."). Accordingly, any answers associated with those questions are not subject to being suppressed.

There's a small subset of questions that could be considered interrogation, but which were justified nonetheless under the public safety exception to the *Miranda* requirements. *See New York v. Quarles*, 467 U.S. 649, 655–56 (1984) ("[T]here is a 'public safety' exception to the requirement that Miranda warnings be given before a suspect's answers may be admitted into

17

evidence, and that the availability of that exception does not depend upon the motivation of the individual officers involved."). "Under the "public safety" exception to *Miranda* . . . police officers can ask a suspect questions without first giving Miranda warnings if they reasonably believe it is 'necessary to secure their own safety or the safety of the public.'" *United States v. Are*, 590 F.3d 499, 505 (7th Cir. 2009) (quoting *York*, 467 U.S. at 649).

Officers responded to a 911 call stating that a man was holding a gun to a boy's head. Soon after Officer Payne detained Mr. Cornelius, there were multiple people outside and chaos ensued. One woman was screaming at another threatening to kill her. Also, the rifle that Mr. Cornelius dropped remained on the ground for at least two to three minutes. Officer Payne was under the impression that there may have also been a hostage situation. Additionally, there was information that someone may have been trying to take a child away and that someone tried to shoot up a truck with people inside. In the midst of this confusion, the darkness of the night, and escalating tempers of the bystanders, Officer Payne and then Officer Donlon were justified in foregoing the *Miranda* warnings when asking Mr. Cornelius what he was doing there, why he came to the house, whether there were other firearms in the vicinity, who the people outside were, who lived there, who was threatening to shoot everybody in the truck, and alike. These kinds of questions were asked of him first by Officer Payne and then twice by Officer Dolton. Their repetition was not the result of trying to incriminate Mr. Cornelius but a consequence of Mr. Cornelius's confusing answers and change in topics. The questions were brief, directed toward ascertaining if anyone was in danger, and were asked over the span of only twelve minutes. Once the officers gathered the information from others and confirmed that no one was in immediate danger, Mr. Cornelius was taken away. Under these circumstances, the public safety exception applies. *See United States v. Hernandez*, 751 F.3d 538, 542 (7th Cir. 2014) (the

18

officers were justified in asking the defendant, a suspected drug dealer who attempted to flee, about a discarded bag that he was carrying because drug dealers are known to arm themselves and grabbing or opening the red bag without knowing what's inside would place the officers at risk of harm). Therefore, the Court finds no violation of Mr. Cornelius's Fifth Amendment rights during the events identified above.

In closing, the Court notes that Mr. Cornelius sought to suppress all of his statements from the night of June 27, 2021, except for the statements made after he was read the *Miranda* rights during his interview with the Task Force Officer. The Government's response addresses only his statements at the Huey Street location.[3] As such, the Government has conceded that Mr. Cornelius statements beginning with him being driven away—none of which are identified by either party—are inadmissible, *see Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("That silence leaves us to conclude, as did the district court, that Bontes concede that the charges identified in their complaint are not 'material' disclosures that would warrant rescission under TILA. Failure to respond to an argument—as the Bontes have done here—results in waiver.") (citing *United States v. Farris*, 532 F.3d 615, 619 (7th Cir. 2008) ("Farris failed to respond to the Government's argument in a Reply Brief, and accordingly, we find that Farris waived his sufficiency of the evidence challenge[.]")), or it is not interested in admitting those facts at trial. Regardless, under the above analysis, Mr. Cornelius was clearly in custody during that time and the Government makes no effort to apply any exceptions to any of the statements made. Accordingly, those statements will be excluded from trial.

---

[3] The Court does note that TFO Sec advised Mr. Cornelius of his *Miranda* rights when he was brought to the station and conducted a short interview during which Mr. Cornelius denied possession of the gun. Mr. Cornelius does not challenge any statements made during this time.

### C. Conclusion

For these reasons, the Court GRANTS IN PART and DENIES IN PART Mr. Cornelius's motion to suppress as detailed in this order. (DE 19.)

SO ORDERED.

ENTERED: January 30, 2023

                                                    /s/ JON E. DEGUILIO
                                                    Chief Judge
                                                    United States District Court