UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

UNITED STATES OF AMERICA

v.                                          Case No. 3:21-CR-90 JD

LEONTIS CORNELIUS

**<u>OPINION AND ORDER</u>**

In the early hours of May 13, 2020, Defendant Leontis Cornelius was having a family get-together when an SUV pulled up and shots were fired toward the party. Mr. Cornelius fired back from a pistol, fending off the attack. Just over a year later, a police officer was responding to a domestic disturbance call when he saw Mr. Cornelius carrying a rifle. Mr. Cornelius, who had been convicted of a felony, was charged in a superseding indictment with two counts of being a felon in possession of a firearm. After trial before a jury, he was found guilty of both counts.

The Court denied Mr. Cornelius's original motion for acquittal under Federal Rule of Criminal Procedure 29, but Mr. Cornelius has now renewed that motion based upon his two affirmative defenses. He has also filed a motion for mistrial and for a new trial under Federal Rule of Criminal Procedure 33. That motion is based upon two principal arguments. First, he argues that during closing argument the Government misrepresented the evidence at trial by arguing that the defendant possessed each weapon prior to the presence of any threat. Relatedly, he argues that the Court committed error when it denied his objections to those arguments. Second, Mr. Cornelius argues that during the rebuttal closing argument the Government engaged in racially demeaning imagery against one of Mr. Cornelius's witnesses, which could not be remedied due to the supposed wholesale prohibition against further objections.

As Mr. Cornelius's arguments have no merit, the Court will deny the motions.

### A. Relevant Facts

For purposes of both Criminal Rule 29 and 33, the evidence at trial is considered in the light most favorable to the Government with all reasonable inferences drawn in its favor. *United States v. Fitzpatrick*, 32 F.4th 644, 648–49 (7th Cir. 2022) ("In a sufficiency-of-the-evidence challenge after a jury verdict, we review the evidence presented at trial in the light most favorable to the government and draw all reasonable inferences in its favor.") (quoting *United States v. Anderson*, 988 F.3d 420, 424 (7th Cir. 2021)); *United States v. Alanis*, 265 F.3d 576, 591 (7th Cir. 2001) (when considering a motion for a new trial, "[w]e consider the evidence in the light most favorable to the government, drawing all reasonable inferences in its favor").

### (1)    *Defendant's prior convictions*

Before 2020, Mr. Cornelius had been convicted of four felony offenses. (Trial Tr. Vol. 1 at 211–17; Gov't Exs. 10, 11, 12, 13.) The last felony conviction occurred in 2004, in this district, for possessing a firearm as a felon. (Trial. Tr. Vol. 1 at 215.) In that case, Mr. Cornelius pleaded guilty and, as part of his plea agreement, acknowledged that he "was a convicted felon at the time [he] knowingly possessed a firearm [on] March 4, 2004. (*Id.*) He was sentenced to 130 months of imprisonment. (*Id.* at 216.) Upon release from prison, he began a term of supervised release and was informed by his probation officer that he could not "possess a firearm, destructive device, or any other dangerous weapon." (*Id.*) He was told this again upon completing his term of supervised release. (*Id.* at 217.)

**(2)**    *May 2020*

On May 13, 2020, just before midnight, South Bend Police responded to a Shot Spotter alert on Elmer Street. (Trial Tr. Vol. 1 at 156.) Mr. Cornelius was outside with members of his family and guests when a car pulled up and its occupants started shooting toward the group. Mr. Cornelius fired back in self-defense with a Smith & Wesson pistol. One of the responding officers was Sgt. Paul Daley who spoke with Mr. Cornelius and wrote a police report. When Sgt. Daley arrived, Mr. Cornelius was still holding the pistol. (*Id*. at 157.) Detective Bruno Martinsky found out about the shooting several days later after receiving Sgt. Daley's report.

Six days later, on May 19, Detective Martinsky called Mr. Cornelius about the shooting and confirmed that he had used the gun the week prior and still had the gun. (*Id*. at 142–147.) Detective Martinsky then arranged for a meeting at Mr. Cornelius's residence so he could pick up the gun. When he arrived, Mr. Cornelius handed over a retail package with a Smith & Wesson pistol inside. (*Id*. at 158.)

**(3)**    *June 2021*

Around 2 a.m. on June 27, 2021, South Bend Police Officer Garrett Payne was called to a house on Huey Street for a disturbance. (Trial Tr. Vol. 1 at 163–164.) When Officer Payne arrived, he found Mr. Cornelius walking from behind a house to the front yard and carrying a rifle. (*Id*. at 166.) Officer Payne asked him, "What's going on?" and, upon seeing the gun, yelled, "drop it, drop it, drop it." (*Id*. at 166–69, Gov't Ex.1, Payne's Body Camera Video at 0:20–30.) Mr. Cornelius dropped the weapon and responded, "I've got a license. I've got a license." (Trial Tr. vol. 1 at 166–167, 170, 181; Gov't Ex. 1, Body Camera Video at 0:30–3.) Mr. Cornelius also told Officer Payne that no one else was in the house, he did not live there, there were no other

guns in the home, and that this was a "child dispute." (Trial Tr. Vol. 1 at 167–168; Gov't Ex. 1, Body Camera Video at 0:40-1:02; 1:25-30.) A moment later, Mr. Cornelius continued: "You good, you good, bro" (Gov't Ex. 1, Body Camera Video at 1:10-17), and "[i]t is nothing, I promise you. Y'all good" (*id.* at 1:30-40).

Officer Payne told another responding officer, Shawn Fredenburg, to get the rifle. (Trial Tr. Vol. 1 at 180–181; Gov't Ex. 2, Fredenburg body camera video.) Officer Fredenburg picked up the rifle and started clearing the rifle to unload the ammunition. Seeing this, Mr. Cornelius exclaimed, "Please don't do that. Don't do that. That's $40 a round. Don't do that. That's $40 a round." (Trial Tr. Vol 1 at 188; Gov't Ex. 2, Fredenburg body camera video at 0:35-42.) Officer Fredenburg testified that, when he responded to the call, he believed someone was holding a gun to a person's head. (Trial Tr. Vol. 1 at 179.) In his interactions with the two officers, Mr. Cornelius said nothing about "somebody holding a gun to his head" or about him "wrestling the gun away from another person."[1] (*Id.* at 176.)

### (4)    *Mr. Cornelius's Defenses*

During his case-in-chief, Mr. Cornelius offered through his own testimony and the testimony of Corey Miller the affirmative defenses of self-defense and public authority.

Mr. Cornelius testified that, on May 13, 2020, he was grilling outside of his home, celebrating his sister-in-law's birthday. His brothers, who had recently been released from prison, were also there. (Trial Tr. Vol. 2 at 340.) According to Mr. Cornelius, his wife gave the sister-in-law a .45 handgun as a birthday present. (*Id.* at 340–41.) Mr. Cornelius did not know when and where the gun was purchased and whether it was presented in a wrapped box. (*Id.* at

---

[1] As noted below, Mr. Cornelius testified to this effect at trial.

374–75.) At some point, an unfamiliar car drove by, circled back, and the occupants opened fire. (*Id.* at 341–43.) The assailants got out of the car and said, "let's get out and walk them down," which Mr. Cornelius knew was slang for, "let's go up and shoot them in the head." (*Id.* 344–45. Sheltered behind a car, Mr. Cornelius looked for something to defend himself with and saw his sister-in-law's purse with the gun box hanging out. He grabbed the gun and tried to shoot but nothing happened. (*Id*. at 345.) He then racked it, stood up, and fired at the shooters, who fled in the car. (*Id*. at 345–46.)

On cross-examination, Mr. Cornelius did not deny that, in his statements to authorities, he omitted any mention of the assailants getting out of the car or grabbing his sister-in-law's gun; instead, he testified that he told them "everything that I felt was relevant." (*Id.* at 377.) According to Mr. Cornelius, when Detective Martinsky tried to retrieve the gun six days later, he had to call his sister-in-law to get it back. His sister-in-law brought the gun over, and he gave it to Detective Martinsky. (*Id.* at 352.)

Mr. Cornelius called his friend, Corey Miller, to testify about the second incident.[2] Mr. Miller said he was with Mr. Cornelius on the night of June 27, 2021, when Mr. Cornelius told him that they should continue their partying elsewhere. (*Id.* at 299–300.) Mr. Miller's girlfriend was also with them and she had to visit or pick up her daughter at a house on Huey Street. As a result, Mr. Miller, his girlfriend, and Mr. Cornelius drove to Huey Street. (*Id*. at 300–301.) When they got there, Mr. Miller and his girlfriend got out of the vehicle and an argument ensued between them and the father of the girlfriend's daughter. (*Id.* at 306.) Hearing the argument, Mr.

---

[2] On direct examination, Mr. Miller stated that he had no felony convictions from the last ten years (Trial Tr. Vol. 2 at 317) but on cross-examination admitted that he was convicted of a felony battery in March 2004, nine years earlier (*id.* at 321). He explained his inconsistency by maintaining that "I didn't know exactly what day I was incarcerated on. I just know it was the past and I put it behind me. I didn't do no calendar marks or nothing." (*Id*. at 321.)

Cornelius joined the group, and at this moment another man with a rifle came from around the house. The man stood three feet away from Mr. Miller and Mr. Cornelius and pointed the rifle to their heads. Mr. Cornelius snatched the rifle out of the man's hands and the man ran away behind the house. (*Id.* at 307–309.) Mr. Miller testified that Mr. Cornelius dropped the rifle "as soon as he snatched it" and just as the police pulled up. (*Id*. at 328.) When police arrived, Mr. Miller did not tell them about the man holding a gun to their heads. (*Id.* at 322.)

Mr. Cornelius's testimony was similar to that of Mr. Miller. Mr. Cornelius said he was celebrating an award of contracts from the City of South Bend and his upcoming birthday. (*Id.* at 357–58.) He wanted to continue celebrating with his friend, Mr. Miller. (*Id.* at 358–359, 385.) Once arriving at Huey Street, he got out of the car upon hearing the commotion, when a man appeared and pointed a gun at his head. Mr. Cornelius instinctively grabbed the gun and the man ran away. (*Id*. at 360–362.) Mr. Cornelius went looking for the man and dropped the firearm behind the house before the officers showed up. (*Id*. at 363.) In response to the testimony of South Bend officers, Mr. Cornelius said his comment about having a license "was me saying that, as like, I can identify who I am." (*Id.* at 364, 392.) He also said that it did not make sense for him to comment on the price of the bullets because "there's no way that you going to find a round that cost $40." (*Id.* at 364.) He blamed his drunken state for the statements heard on the bodycam videos claiming that the individual in the video recordings is "a drunk version of me." (*Id.* at 393–94.)

### (5)    *Jury Instructions*

Before the parties' opening statements the Court instructed the jurors that, among other things, they "should not be influenced by any person's race, color, religion, national ancestry, or

sex," and that any "statements, arguments, questions, or objections that the lawyers make are not evidence. If what a lawyer says is different from the evidence as you hear or see it, the evidence is what counts," and the jurors' "memory is what counts." (Trial Tr. Vol. 1 at 114, 117.) The court also instructed that the Jury may rely on both direct and circumstantial evidence and draw any reasonable inferences. (*Id.* at 116.) The Court repeated these admonitions in its final instructions to the Jury. (Trial Tr. Vol 2 at 423–24 ("do not let any person's race, color, religion, national ancestry, or gender influence you."); *id.* at 425 ("lawyers' statements and arguments are not evidence. If what a lawyer said is different from the evidence as you remember it, the evidence is what counts."); *id.* at 426 (jury is allowed to draw reasonable inferences).)

### (6)  *Closing Arguments*

During its initial closing argument, the Government argued that Mr. Cornelius possessed the Smith & Wesson pistol before he began shooting it on May 13, 2020, and that he brought the rifle to Huey Street on June 27, 2021. (Trial Tr. Vol 2 at 436–37.) As for the May 13th incident, the Government based their theory of possession on, from their perspective, the unbelievability of Mr. Cornelius's claim: that when the drive-by shooters started firing, the gun was fortuitously on the ground in his sister-in-law's purse and within arm's reach, already loaded, which permitted Mr. Cornelius to quickly return fire. In addition, the Government argued that Mr. Cornelius retained possession of the pistol as demonstrated by the fact that when Detective Martinsky called him a week later and asked if he still had the pistol Mr. Cornelius said that he did. (*Id*. at 435-437.) Initially, Mr. Cornelius's counsel did not object.

The prosecutor then discussed the June 27th incident. He said that "Mr. Cornelius drove that rifle to the house on Huey Street" at which point Mr. Cornelius's counsel objected on the

grounds that the statement "mischaracterizes the evidence." (*Id.* at 437.) The Court then

reminded the Jury that the attorney's statements are not evidence:

> Ladies and gentlemen of the jury, I will leave it to your memories to recall what the evidence in this case is, and I will remind you what the attorneys say in the closing arguments is not evidence and you should disregard it unless you believe it is supported by the evidence as you recall.

(*Id.*)

The Government continued to recount Mr. Cornelius's statements to Officer Payne ("I've

got a license" and "It is nothing, I promise you. Y'all good.") and his reaction to Officer

Fredenburg clearing the rifle of ammunition ("Stop. Don't do that. That's $40 a round.") as

inferences that Mr. Cornelius was the owner of the firearm and therefore in possession of the

firearm at the time of his arrival at Huey Street and before any threat was made. (*Id.* at 437–39.)

The Government's argument clearly attempted to suggest to the jury that only a person with a

financial interest in the cost of the ammunition would object to the officer's ejection and that the

claim about having a license was in direct relation to that particular firearm, both suggesting

ownership.

Sometime later, the Government continued to counter Mr. Cornelius's self-defense

theories by making the conclusory statement: "Mr. Cornelius possessed the firearms before he

was ever in danger in May of 2020 or June 2027, 2021." (*Id.* at 443.) At this point, Mr.

Cornelius's other counsel again objected on the grounds that there was no evidence to support

that claim. (*Id.*) The Court noted that this was a time for argument about what the evidence

suggests and that the Government "can argue the facts and what he believes they infer." Clearly,

the Court was of an opinion that the Government was only citing to evidence before the jury, not

citing to matters outside the evidence, and seeking only to make inferences based upon the

evidence. As such, the Court believed the objection had no merit. The exchange continued:

> Court: That's his argument, and your opportunity to rebut that is in your closing argument, not to object. So you want to make a —
>
> Mr. Frankel: I think we have to preserve the record, Judge.
>
> Court: You preserve the record by making your argument about what you believe the evidence infers and that's your remedy, so deal with it in closing argument.

(*Id*. at 443–44.)

At no time did the Court admonish defense counsel not to make future objections.

After the sidebar, to once again argue their belief about the implausible nature of Mr. Cornelius's testimony, the Government recounted the circumstances surrounding the exchange of gunfire in May 2020:

> This was a drive-by shooting. He didn't go on the ground, grab a wrapped gift present, open it up, load the gun, and all the time that the people in the car are getting out of the car, coming over, and then decide to drive away before he shoots back. He had the gun ready. He had the gun loaded. He used the gun because he possessed the gun.

(*Id*. at 444.)

As well, the Government once again recounted the evidence relative to the June 27, 2012, incident, citing Mr. Cornelius's own testimony, and suggested that the claims of "having a license" and objecting to the ejection of the expensive ammunition were indicative of his ownership and possession prior to the presence of any threat, contrary to his claim of self-defense.

The Government concluded the initial closing argument by challenging Mr. Miller's testimony:

> I should address the testimony from Corey Miller this morning. He is the gentleman that was contacted first two weeks ago about this case and asked to come and testify, and he testified to somebody running around with a rifle, no name, and pointing it at him and Mr. Cornelius and running away still in the area, but Mr. Miller decided not to—or was unable to—I don't remember what the testimony was. He couldn't

tell the police officers about it because they weren't interested or something like that. You have the option of disregarding his testimony.

And if you pay special attention to the five elements of self-defense and you compare it to Mr. Miller's testimony, you'll find that he has a very good recollection of certain points that usually match up with the five elements, and other details like the name of the person who pointed the gun at them are a little hazy. It is your option to disregard Mr. Miller's testimony in this case.

(*Id.* at 445–46.)

During his closing, defense counsel argued that in both instances Mr. Cornelius acted in self-defense, seemingly acknowledging the Government's reliance on the trial evidence and insisting that "Everything Mr. McKeever argued to you was just his speculation trying to weave the pieces of the evidence together in a way that supports his theory of what happened. It's just all speculation." (*Id.* at 452–53.) At no time did defense counsel attempt to identify matters cited by the Government not properly before the jury. Defense counsel provided a rather elaborate recount of the testimony of Mr. Cornelius and Mr. Miller and suggested that was an accurate account of the events of June 27th and that the Government's interpretation of the evidence was "nonsensical."

In rebuttal closing, the Government began with a focus on the credibility of the witnesses, citing the Court's Final Instruction No. 8, the credibility instruction. (Trial Tr. Vol. 2 at 462–63; DE 70 at 8.)  The Government argued that for the Jury to find that self-defense applied in the case, it would have to believe Mr. Cornelius's testimony:

Mr. Cornelius knowingly possessed a firearm on [sic] May of 2020. We know this because Mr. Cornelius's story to you about what actually happened to you on that night is absolutely incredible. The reason Mr. Cornelius was able to fire shots at this car driving by is because he had the Smith & Wesson, the small pistol, at the ready on his person ready to shoot out the windshield and then continue to fire shots as that car drove away.

He told you a story today on the stand that someone got out of the car, said, "Let's walk up on these people," and started to fire shots. Think about the reasonableness of that in light of all the testimony here.

As someone is walking up on him, he happens to know that his sister-in-law opened a gun on the porch that's made its way down into the front yard that he miraculously found in the purse and is able to fire shots as the car drives away. That's absolutely incredible, unbelievable, and a preposterous story.

What actually happened is he had that gun. He wasn't supposed to have that gun. If someone actually got out of that car, walked up on him, drew down on him, wanted to shoot him, there was going to be a body in the street on May 13th of 2020. There was no mystery person. There was no anyone getting out of the car.

The only evidence you have is his own story. He's the one with the vested interest, a vested reason to slant the testimony and have you buy into this theory that this was self-defense and that this gun was just available to him. But the government submits to you that the evidence shows he possessed that gun before, during, and after the shooting on May 13, 2020.

Part of the evidence also includes Bruno Martinsky's testimony. Bruno Martinsky called Leontis Cornelius on May 19. He testified for you. He asked, "Do you still have the gun," to which Mr. Cornelius responded yes. Okay. Mr. Cornelius didn't say, "Hey, my brother has it. It actually was a gift. It wasn't even mine. I'm going to have to get it for you. You'll have to come back later."

Responded affirmatively to Officer Martinsky, "I still have the gun," meaning I have had that gun for the last six days, and I knew I had that gun for the last six days. So that evidence has been proven to you beyond a reasonable doubt that during the period of May—beyond, before, and after the shooting—Mr. Cornelius was in unlawful possession of that firearm.

(*Id.* at 463–65.)

The Government then discussed the second incident:

So let's move forward to June 27 of 2021. Again, the government submits to you an incredible story. I mean, what evidence did you hear from the defense today? You heard three witnesses, one of whom doesn't have any relevance in the case. I worked with Mr. Cornelius. He was a nice guy. Okay. Mr. Frankel says his client is a nice, good person. Well, guess what? Good people sometimes make bad choices, and Mr. Cornelius made two very bad choices, two incredible choices that have really put him in a situation where he has now come before you and had an opportunity to slant his testimony to get you to buy into his version of events because he wants you to believe that he went over on June 27th. He's partying it up

with his boy, Corey Miller. They're going to celebrate, but we have a vague plan to go pick up a child and then go party with them.

No. What you heard was the uncontradicted evidence, black and white, of the body camera of the two officers that responded to this scene who saw Mr. Cornelius around the backside of the house with this rifle in his hands ordering him—not once, not twice—three times, "Drop it. Drop it. Drop it," to which he complies.

Okay. Mr. Cornelius went to that house knowing there was a child dispute. He told the officers, "This is just a child dispute. Nothing's going on." Why do we know that this is not just some rifle he wrestled out of someone's hands? Because his response to officers when ordered to drop it is, hands up, "I've got a license." Officer Payne even asks him, "Hey, man, what is going on here?" This is when the people are starting to come out of the house. The two women are screaming in the background. You all heard it on the video.

What is going on? Is the reasonable, common sense, truthful response, "I've got a license"? No. If he actually was confronted, had a gun to his head, wouldn't the response to what's going on be, "Hey, man, some guy just pointed a gun at my head, and he ran that way. Go arrest him. He's the guy you're looking for"? That's not what we heard on the tape. That's not what Mr. Cornelius told the officer.

Instead, he said, "I've got a license. Don't worry." Well, he wasn't driving a car. He wasn't hunting deer. He wasn't going fishing. He said, "I have a license," in a direct response as to why he had this gun in his hands.

Second, moments later Officer Fredenburg comes around the backside of the house and, what do you know, nobody is running away from the scene. This mystery person who just pointed a gun at Mr. Cornelius's head, who Mr. Cornelius hasn't even told the officers about, is nowhere to be found.

Officer Fredenburg picks up that rifle and in front of the defendant starts clearing it. If this wasn't his gun, if he knew nothing about this gun, why would he be telling the officer, "Please don't do that," begging with him—not once, not twice—three times on that video, "Please, please, don't do that. Don't do that. 40 bucks a round, man. That is $40 a round. Please don't do this."

You own something, you possess it, because you know about it. Most of you drive cars probably here on the jury. You know these days gas is 3.50 to $4.00 a gallon. That's because you know. You have regular contact with it. It's something you do on a regular basis.

This isn't just some situation where Mr. Cornelius has miraculously saved the day. He is guaranteeing these officers' safety because he brought this gun to this child dispute, and he was going to be that show of force. He knowingly possessed this firearm on June 27, 2021.

(*Id*. at 465–67.)

There were no objections during the Government's rebuttal argument.

After the closing arguments and before deliberations, the Court once again reminded the jury "that the attorneys' arguments are not evidence and that you will disregard what they said unless it was supported by the evidence." (*Id.* at 472.)

The jury deliberated about two hours before finding Mr. Cornelius guilty on both counts.

### B.  Legal Standard

Federal Rule of Criminal Procedure 29(a) governs motions for judgment of acquittal. When a defendant moves for judgment of acquittal under Rule 29, a court must ask whether evidence exists from which any rational trier of fact could find the "essential elements" of the crime beyond a reasonable doubt. *United States v. Garcia*, 919 F.3d 489, 496 (7th Cir. 2019). The movant faces a "nearly insurmountable hurdle" because the Court considers the evidence in the light most favorable to the Government and will grant the motion "only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Id.*; *United States v. Dewitt*, 943 F.3d 1092, 1096 (7th Cir. 2019) (citing *United States v. Blassingame*, 197 F.3d 271, 284 (7th Cir. 1999)) (internal quotations omitted). Thus, a Rule 29 motion is granted only if the record is devoid of evidence from which a jury could find guilt. *See United States v. Jackson*, 5 F.4th 676, 682–83 (7th Cir. 2021).

"As a general matter, 'a mistrial is appropriate when an event during trial has a real likelihood of preventing a jury from evaluating the evidence fairly and accurately, so that the defendant has been deprived of a fair trial.'" *United States v. Tanner*, 628 F.3d 890, 898 (7th Cir. 2010) (quoting *United States v. Collins*, 604 F.3d 481, 489 (7th Cir. 2010)). "[T]he trial court

judge is in the best position to determine the seriousness of any incidents that occurred during the trial." *United States v. Cheska*, 202 F.3d 947, 950 (7th Cir. 2000), modified (Mar. 21, 2000). "A prosecutor's alleged misconduct during closing arguments requires a mistrial only if (1) the conduct was actually inappropriate; and (2) in light of the entire record, the inappropriate conduct deprived the defendant of a fair trial." *Id.* (citing *Cheska*, 202 F.3d at 950). If the challenged remarks are proper, "the inquiry is over, and there is no reason to grant a new trial." *Cheska*, 202 F.3d at 950. Otherwise, "the court should evaluate the remark in light of the entire trial to determine whether it deprived the defendant of a fair trial." *Id.*

> In assessing the effect of the remark on the fairness of the trial, the court should consider:
>
> 1) the nature and seriousness of the prosecutorial misconduct; 2) whether the prosecutor's statements were invited by conduct of defense counsel; 3) whether the trial court instructions to the jury were adequate; 4) whether the defense was able to counter the improper arguments through rebuttal; and 5) the weight of the evidence against the defendant.

*Id.*

As for Federal Rule of Criminal Procedure 33(a), "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." *Id.* "Courts have interpreted Rule 33 to require a new trial 'in the interests of justice' in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989). Granting a motion for a new trial "is reserved for only the most extreme cases." *United States v. Peterson*, 823 F.3d 1113, 1122 (7th Cir. 2016); *see also United States v. Coscia*, 4 F.4th 454, 465 (7th Cir. 2021) (noting that the courts approach motions for new trial with great caution and are wary of second-guessing jury determinations). "A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *United States v. Santos*, 20

F.3d 280, 285 (7th Cir. 1994) (quoting *United States v. Morales*, 902 F.2d 604, 605 (7th Cir. 1990), *amended on other grounds*, 910 F.2d 467 (7th Cir. 1990)).

"The ultimate inquiry is whether the defendant was deprived of a fair trial." *United States v. Friedman*, 971 F.3d 700, 713–14 (7th Cir. 2020) (quoting *United States v. Lawrence*, 788 F.3d 234, 243 (7th Cir. 2015)). In considering a motion for a new trial, "a court may properly consider the credibility of the witnesses, and may grant a new trial if the verdict is so contrary to the weight of the evidence that a new trial is required in the interest of justice." *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999). In doing so, "the court considers whether the verdict is against the manifest weight of the evidence, taking into account the credibility of the witnesses." *Id*. The Court must also consider whether any alleged improprieties "impacted the outcome of the trial, and [must reverse] only if there is a reasonable probability that, in the absence of the improprieties, the defendant would have been acquitted." *United States v. McGee*, 408 F.3d 966, 984 (7th Cir. 2005) (citing *United States v. Boyd*, 55 F.3d 239, 241 (7th Cir. 1995)).

### C. Discussion

#### 1.  *Motion for Declaration of Mistrial and Motion for New Trial*

##### (a)  *Reasonableness of the Inferences*

Mr. Cornelius argues that the Government committed egregious misconduct during their closing arguments, warranting a declaration of mistrial and a new trial. In particular, he submits that their misconduct involved arguing facts not in evidence, raising inflammatory arguments, suggesting that Mr. Miller lied during his testimony, and suggesting that Mr. Cornelius committed perjury. Mr. Cornelius claims that the Court failed to avert this misconduct by

prohibiting his counsel from objecting in the face of these improprieties. Mr. Cornelius's arguments are meritless.

During the closing argument, the Government suggested that Mr. Cornelius possessed the Smith & Wesson pistol before the shootout on May 13, 2020, and then possessed the rifle before arriving at Huey Street on June 27, 2021. Mr. Cornelius's counsel objected to that characterization as an argument not based on evidence. In response, the Court reminded the Jury that the attorney's statements aren't evidence and that only the evidence that was admitted at trial counts. Sometime later, Mr. Cornelius's counsel objected again on the same basis, and this time the Court held a sidebar. The Court asked Mr. Cornelius's counsel why he was interrupting the closing argument. Counsel responded that "[t]here is absolutely nothing about how Mr. Cornelius possessed that weapon before he was seen by the police possessing it." The Court then explained that the prosecutor "can argue the facts and what he believes they infer," and that Mr. Cornelius's counsel will have a chance to do the same during his presentation. (Trial Tr. Vol 2 at 443–44.) Mr. Cornelius now argues that the Government's statements constituted egregious misconduct, which the Court failed to stop, and compounded its error by prohibiting his counsel from objecting again.

Mr. Cornelius is wrong in both respects: his objections during the Government's closing argument had no basis in law, as the Government did not argue facts outside the evidence, and the Court did not prohibit his counsel from objecting during any part of the Government's presentation but was of the opinion that this particular argument had no merit and was more properly addressed in a discussion of the facts during the respective closing arguments. "While prosecutors may not infuse their closing arguments with facts that the court has not admitted into evidence, they may argue reasonable inferences from the evidence that the jury has seen and

heard." *United States v. Waldemer*, 50 F.3d 1379, 1383 (7th Cir. 1995). "The term 'reasonable inference' must be defined contextually. Whether the evidence bears logical and proximate connection to the point the prosecutor wishes to prove are perhaps the most obvious considerations in determining whether the inference is reasonable. Also important is whether the prosecutor makes the argument solely to inflame the passions of the jury." *Id*. at 1384.

Mr. Cornelius maintains that there was no evidence that he possessed the gun before the shootout in May 2020 and before arriving at Huey Street in June 2021. Yet both inferences are reasonable and bear proximate connection to the evidence presented at trial. As for May 2020, the Jury could reasonably infer that, given the speed with which Mr. Cornelius responded to the attack, as well as the circumstances he cites explaining how he came about to possess the gun, he possessed the gun prior to the attack. Although he insists that his account is the only one that is sensical, that is not necessarily so. His story—that his wife gifted the Smith & Wesson to his sister-in-law, which happened to be in a box sticking out of the sister-in-law's purse near the car behind which he was crouching during the attack, which he pulled out of the packaging to shoot back (it also happened to be loaded)—is not without reproach, especially given the speed with which Mr. Cornelius could react. And it is not the only possible explanation of how he managed to shoot back at the assailants. Mr. Cornelius's account becomes even more problematic when considering that he never told the responding officers that the gun belonged to his sister-in-law. In addition, when Detective Martinsky called Mr. Cornelius on May 19, Mr. Cornelius told him he still had the gun and said nothing about the sister-in-law. (Trial Tr. Vol 1 at 142–147.)  In any event, in arguing this inference, the Government relied solely on the evidence at trial and never cited matters outside the record. Nor does Mr. Cornelius explain what matters outside the record were cited by the Government in support of the inference.

It was also not unreasonable for the Government to argue that the Jury could reasonably infer that Mr. Cornelius brought the rifle to Huey Street on June 27, 2021. Mr. Cornelius was holding the rifle when Officer Payne walked up to the house. Although Mr. Cornelius claimed that he snatched the gun from someone who pointed it at his head and then immediately dropped it, his conduct and his statements to the responding officers could suggest a different conclusion. Officer Payne saw him holding the rifle and ordered him to drop it. Mr. Cornelius followed the command telling Officer Payne not that someone had just held a gun to his head which he snatched away, but that "I've got a license." It was not improper for the Government to suggest that Mr. Cornelius's response was intended to suggest to the officer that the possession of the firearm was legal because it was his and he had a license to possess it. And when Officer Fredenburg began clearing the bullets from the rifle, Mr. Cornelius complained of him wasting the ammunition at "$40 a round." In the first instance, it's reasonable to infer, as the Government argued, that Mr. Cornelius was trying to justify the illegal possession of the rifle, which he would not have had to do if he had just snatched the gun from the assailant. And unless the rifle was his, rather than an assailant's, it would have made little sense for Mr. Cornelius to be concerned about Officer Fredenburg wasting the ammunition. Rather, given what Mr. Cornelius actually did and said, it is reasonable to infer that the rifle belonged to Mr. Cornelius, that is, he brought it with him to Huey Street, despite Mr. Miller's and Mr. Cornelius's testimony to the contrary.[3] Accordingly, given the reasonable inferences that the Government was making and that they relied only on evidence before the jury, Mr. Cornelius's objections were without merit, and the

---

[3] Again, while Mr. Cornelius insists that only the defense's account is based in reality, it isn't flawless. For example, both Mr. Cornelius and Mr. Miller claimed that he dropped the gun immediately after snatching the rifle from the assailant and before police arrived, but Officer Payne saw him walking from around the house with the gun in hand and ordered him to drop it. Moreover, Mr. Miller maintained this story even though he later claimed that he was across the street when he saw Mr. Cornelius drop the gun, but still maintaining that this happened before police arrived.

Court properly denied the objection and admonished his counsel that the proper course was to wait for his turn to argue his interpretation of the evidence. *See United States v. Wills*, 346 F.3d 476, 492 (4th Cir. 2003) ("The district court informed Wills that he would be given the opportunity during his own closing argument to present his own counter arguments to the government's interpretation of the evidence. Thus, the court did not place unreasonable restrictions on Wills by preventing him from objecting during the government's closing arguments and did not abuse its discretion."); *United States v. Wallace*, 889 F.2d 580, 584 (5th Cir. 1989) (a defendant was not denied a fair trial when the trial court admonished his attorney not to make unnecessary objections during the government's closing argument).

Moreover, the Court's admonition was limited to this particular issue only, and Mr. Cornelius has not explained why he construed it to apply to any other future matter. For example, Mr. Cornelius insists that he could not object to the perceived racially inappropriate comments by the Government during the rebuttal closing but the Court did not at any point tell his counsel that objections during the closing argument weren't allowed. While "[b]road discretion is reposed in the trial court to control closing arguments," *United States v. Sands*, 815 F.3d 1057, 1063 (7th Cir. 2015), here the Court did little more than overruled an objection and admonished Mr. Cornelius's counsel to take up the issue *complained of* at an appropriate time. To say that the Court foreclosed all objections misrepresents what the Court actually said.

Returning to the propriety of the Government's argument that Mr. Cornelius possessed both firearms before any threat existed, the Court notes that the effect of the remarks had no impact on the fairness of trial. As already explained, the Government's comments were properly presented, as they were reasonable inferences of the trial testimony and did not rely on matters outside the record evidence. Moreover, the jurors were correctly and repeatedly instructed on the

applicable law,[4] and Mr. Cornelius's counsel had adequate opportunity during his closing argument to counter the Government's inferences during the initial closing argument, and the weight of the evidence was heavily stacked against Mr. Cornelius. *See Cheska*, 202 F.3d at 950 ("[T]he court should evaluate the remark in light of the entire trial to determine whether it deprived the defendant of a fair trial.") The case against Mr. Cornelius wasn't based on circumstantial evidence or a theory of constructive possession. On both counts, officers testified that Mr. Cornelius possessed the firearms at issue, and the jury did not have to believe his strained explanations of how he came to possess them.

Lastly, Mr. Cornelius complains that the Government questioned the veracity of his and Mr. Miller's testimonies at trial. But "the government is allowed to comment on the credibility of a witness . . . as long the comment reflects reasonable inferences from the evidence adduced at trial rather than personal opinion." *United States v. Nunez*, 532 F.3d 645, 654 (7th Cir. 2008). "If a defendant puts his credibility at issue by testifying at trial, a prosecutor may comment on the defendant's credibility as long as the comments are supported by the evidence." *Edwards v. Calloway*, 2020 U.S. Dist. LEXIS 171875, *26 (N.D. Ill. Sept. 21, 2020) (citing to *United States v. Turner*, 651 F.3d 743, 752 (7th Cir. 2011); *see also United States v. Roux*, 715 F.3d 1019, 1031 (7th Cir. 2013) ("[W]hen the defendant elects to testify on his own behalf, the government, within reason, may through its questions and argument properly bring to the jury's attention the extent to which his version of events is uncorroborated and rests on his own credibility.") The Government did just that: they did not merely tell the jury to disbelieve Mr. Cornelius and Mr. Miller but they contrasted their testimonies with all the facts introduced at trial and pointed out

---

[4] It's worth noting again that, among other things, the Court instructed the Jury many times—at the beginning of trial, during the final jury instructions, and before the jurors were sent to deliberate—that the attorneys' statements weren't evidence and that their verdicts must be based on evidence introduced at trial.

the inconsistencies. This constitutes a legitimate trial practice, *see Portuondo v. Agard*, 529 U.S. 61, 69 (2000) (prosecutor could comment on defendant's credibility as a witness because "when a defendant takes the stand, 'his credibility may be impeached and his testimony assailed like that of any other witness'"). As a result, Mr. Cornelius's motion for a new trial on this ground is unavailing.

> (b) *Allegations of racial impropriety*

Next, the Court will address Mr. Cornelius's argument that, during the rebuttal portion of closing argument, the Government used racially derogatory language when discussing the relationship between Mr. Cornelius and Mr. Miller on June 27, 2021.

Here's what the prosecutor said:

> So let's move forward to June 27 of 2021. Again, the government submits to you an incredible story. I mean, what evidence did you hear from the defense today? You heard three witnesses, one of whom doesn't have any relevance in the case. I worked with Mr. Cornelius. He was a nice guy. Okay. Mr. Frankel says his client is a nice, good person. Well, guess what? Good people sometimes make bad choices, and Mr. Cornelius made two very bad choices, two incredible choices that have really put him in a situation where he has now come before you and had an opportunity to slant his testimony to get you to buy into his version of events because he wants you to believe that he went over on June 27th. He's *partying it up with his boy, Corey Miller*. They're going to celebrate, but we have a vague plan to go pick up a child and then go party with them.

(Trial Tr. Vol. 2 at 465 (emphasis added).)

Mr. Cornelius argues that the Government's reference in this passage to Mr. Cornelius "partying it up with *his boy*, Corey Miller" constituted a use of a racial epithet that interjected race into the trial and prejudiced Mr. Cornelius. Relying on an affidavit from Professor Omar M. McRoberts, who has worked and conducted research for the past twenty-three years in the Department of Sociology at the University of Chicago (*see* McRoberts Aff., DE 106-1 ¶¶ 1–2),

Mr. Cornelius submits that the use of the word "boy" in relation to Mr. Miller, who is black, conveyed "racist subtext regarding Mr. Miller's suitability as a witness and drew attention to his racial characteristics without the need to use more explicit racist language." This is so because the term "boy" in relation to a black adult male or his companion "in the context where the responsibility of the African-American male is in question. . . can *only be taken as cynical and racist* given the historical insinuation of the term is that black men are not true, dignified men, but rather lazy and irresponsible boys by nature." (Def.'s Reply Br., DE 106 at 8 (quoting McRoberts Aff., DE 106-1 ¶ 15 (quotation marks omitted) (emphasis in the brief).) Mr. Cornelius maintains that the Government used the term intentionally to imply that "Mr. Miller and Mr. Cornelius are not real adults, but nefarious irresponsible persons conspiring to commit criminal acts." (*Id*.) Mr. Cornelius adds that "its use in this context at  closing argument by a Caucasian prosecutor as a descriptor of an African-American adult male, when an African-American male's innocence is in doubt *is* discriminatory per se as it has only a 'cynical' and 'racist' contextual meaning, stemming from the term's history as a racial epithet." (*Id.* (emphasis in the brief).)

Also, relying on Professor McRoberts's affidavit, Mr. Cornelius likens the prosecutor's reference to "his boy" as a "dog whistle," that is, coded messaging to garner support for a guilty verdict:

> The government's closing argument was a resort to language and imagery of black men as a criminogenic, anti-social, and as a historically untrustworthy segment of the American population. Here, a white person referring to an adult black man as 'boy' should be understood as an instance of the phenomenon known in social psychology as dog whistle. Dog whistling is the use of coded language to convey a meaning to those intended to hear it without directly articulating that meaning. The phenomenon . . . has been conceptualized in social scientific analyses of political discourse, particularly regarding discussions of social policy where race enters not as a topic of direct discussion, *but as a set of negative innuendos about the perfidious traits of particular racial and ethnic minorities*. In summary, the usage

of the term 'boy' as a negative racial epithet to describe black men has a deep history in the United States, and remains in use both as a direct insult and as 'dog whistle' language intended to invoke racist judgement [sic] against black men. The government's statement that Mr. Cornelius was partying it up with his "boy" should be understood in this milieu of referring indirectly to the irresponsibility of black men, cultivating bias, and inciting "negative innuendos" about Mr. Cornelius and Mr. Miller.

(Def.'s Reply Br., DE 106 at 8–9 (quotation marks and citations to McRoberts Aff. omitted) (emphasis in the brief).) According to Mr. Cornelius, since neither he nor Mr. Miller themselves referred to being each other's "boys", the Government's use of the expression "his boy" cannot be justified. Additionally, Mr. Cornelius claims, once again, that the Court prohibited him from making any objections during the Government's closing argument and was therefore left without a remedy to address the misconduct by the Government.

It is undisputed that "[t]here is no place in a criminal prosecution for gratuitous references to race, especially when a defendant's life hangs in the balance." *Smith v. Farley*, 59 F.3d 659, 663 (7th Cir. 1995). "Elementary concepts of equal protection and due process alike forbid a prosecutor to seek to procure a verdict on the basis of racial animosity." "The Constitution 'prohibits a prosecutor from making race-conscious arguments since it draws the jury's attention to a characteristic that the Constitution generally demands that the jury ignore.'" *Aliwoli v. Carter*, 225 F.3d 826, 831 (7th Cir. 2000) (quoting *United States v. Hernandez*, 865 F.2d 925, 928 (7th Cir. 1989)). "As a general rule, a racial remark is improper if it is 'intentionally injected into volatile proceedings where the prosecutor had targeted the defendant's ethnic origin for emphasis in an attempt to appeal to the jury's prejudices.'" *Aliwoli*, 225 F.3d at 831 (quoting *Hernandez*, 865 F.2d at 928). "But reversals on this ground are rare." *Farley*, 59 F.3d at 663 (observing that in the previous fifteen years, there was only one reported appellate case, *United States v. Doe*, 903 F.2d 16, 24–25 (D.C. Cir. 1990), to do so). "The cases

hold that one or two isolated references to race or ethnicity, wholly unlikely to sway a jury, do not compel a new trial on federal constitutional grounds when the defendant's guilt is established by overwhelming evidence." *Farley*, 59 F.3d at 664 (collecting cases).

"Like any charge of prosecutorial misconduct, we first view the statements to determine whether they were improper. If they were inappropriate, we view the record as a whole and consider whether they deprived the defendant of a fair trial." *Aliwoli*, 225 F.3d at 831.

The Court must start its discussion by observing that Mr. Cornelius did not object to the prosecutor's use of the term "partying it up with his boy, Corey Miller" at the time of the closing argument. And while Mr. Cornelius insists that the Court prohibited him from objecting to the Government's closing argument, as explained above, this is simply an unreasonable interpretation of the Court's directive. Given the absence of objection, the alleged misconduct is reviewed under a standard of plain error "by which we mean that it was obvious, affected the defendant's substantial rights to such an extent that he would not otherwise have been convicted, and seriously affected the fairness, integrity, or public reputation of the judicial proceedings. That is a lengthy way of saying that we will not grant [the defendant] a new trial unless there was an error so egregious that the district judge should have stepped in even though no objection was made." *United States v. Alexander*, 741 F.3d 866, 869–70 (7th Cir. 2014).  But under a standard of either plain error or harmless error the Court's ruling would not be altered as it finds no error whatsoever.

Mr. Cornelius relies heavily on the affidavit of Prof. McRoberts to show that the term "boy" is racially demeaning when used to refer to a black man. That's undisputed. But the dispute here is over the phrase "his boy." In interpreting the Government's conduct and the potential impact of the reference it is critical to assess the context in which the phrase is used.

According to the Merriam-Webster Dictionary, the word "boy" has multiple meanings. According to one of them, "boy" is "disparaging and offensive [when] used to address a man of color and especially a Black man." Merriam-Webster Dictionary Online, https://perma.cc/HPB6-K4YP (last visited Nov. 16, 2023). The dictionary notes that the "deeply offensive use of the word boy to address an adult man of color has a strong association with sense [of a male servant or an enslaved man] and is a term expressive of racist condescension." *Id*. However, the same dictionary recognizes that the word "boy" used in slang means "a close male friend." *Id*. As an example of usage it quotes the following sentence: "Now, the receiver is getting a second chance, thanks to old friend Tom Brady. 'Tom is *my boy*,' [Antonio] Brown said Wednesday during his introductory video press conference in Tampa.—Michael Hurley." *Id*. (emphasis added). Urban Dictionary also provides the same meaning of the term:

> My boy
>
> noun - slang term given to your male best friend.
>
> This is usually the guy that your parents reference you jumping off the bridge with, but really you are such good friends that if he jumps you wouldn't jump with him, you will be at the bottom waiting to catch him.
>
> This is the guy that you don't have to ask to be your best man, he knows he already is the best man.
>
> The one person aside from our creator that knows all of your secrets inside and out.

Urban Dictionary, https://perma.cc/GH9W-47VD (last visited Nov. 16, 2023).

So, while there is no doubt that the word "boy" when used to refer to a black man is extremely offensive, this may not necessarily be the meaning employed by the user of the term "my boy" or "his boy" as was the case here. Again, context matters. Mr. Cornelius has not shown that anyone on this particular Jury reasonably understood the Government to be

demeaning Mr. Miller's human dignity rather than noting that the two were the best of friends. Nor that the Government intended to do so. Here, the comment by the Government was precipitated by a discussion of witness credibility and the events of June 27th as testified to by Mr. Cornelius and Mr. Miller, two of the three witnesses who testified on Mr. Cornelius's behalf. The Court believed then as it does today that the reference was intended to underscore to the jury that Mr. Miller and Mr. Cornelius were friends and that, for that reason, the jury should weigh Mr. Miller's testimony cautiously. There is nothing inappropriate about that. Nor is there any dispute that Mr. Cornelius and Mr. Miller were friends, as they each testified to the same and that they were going to continue to party after stopping at the Huey Street address.

Insofar as the "various factors, including context, inflection, tone of voice, local custom, and historical usage" help understand the meaning of the word, *see Ash v. Tyson Foods, Inc*, 546 U.S. 454, 456 (2006), the Government's inflection and tone of voice did not suggest that the prosecutor was invoking a racial context. In fact, the Court cannot recall any instance during the trial of race being made an issue. And the Government's reference to "his boy" was made only once, suggesting it was not a point of emphasis for the Government. Mr. Cornelius's reply brief alleges that the Government had a prohibited racial animus against Mr. Miller. But he points only to the use of the term "his boy" on one occasion. The term cannot be said to have a singular meaning. Mr. Cornelius has not identified any other basis to suggest that the Government exhibited racial animus. And again, the Court's own observations at trial have found none. The Court has no reason to doubt that the reference was intended solely to undermine the credibility of Mr. Miller because of his relationship with Mr. Cornelius, consistent with the usage for

describing a close friend.[5] Mr. Cornelius has not shown that the prosecutor injected the remark to

target his or Mr. Miller's race. *See Aliwoli*, 225 F.3d at 831 ("As a general rule, a racial remark is

improper if it is intentionally injected into volatile proceedings where the prosecutor had targeted

the defendant's ethnic origin for emphasis in an attempt to appeal to the jury's prejudices."

(quotation marks and citation omitted). Moreover, throughout trial, the Court explicitly and

repeatedly told the Jury that the race of any trial participant cannot be considered in reaching the

verdicts. Mr. Cornelius has not pointed to anything to suggest that the Jury failed to follow this

admonishment.


(c) *Allegations of other prosecutorial improprieties*

Mr. Cornelius alleges other prosecutorial improprieties. He claims that, during the

rebuttal portion of the closing argument, the prosecutor inflamed the passions of the jury by

stating that, during the June 27, 2021, incident, Mr. Cornelius chose to "be that show of force."

Mr. Cornelius also accuses the Government of suggesting that Mr. Cornelius, Mr. Miller, and

Mr. Miller's girlfriend, intended to pick up the child at the Huey Street address and continue

partying with the child present. Both accusations are unfounded.

As for the comment regarding the presence of the child, the Government was recounting

the facts and appears to challenge Mr. Cornelius's story that the trip to Huey Street was an

unplanned stop:

> Okay. Mr. Frankel says his client is a nice, good person. Well, guess what? Good
> people sometimes make bad choices, and Mr. Cornelius made two very bad choices,
> two incredible choices that have really put him in a situation where he has now

---

[5] Such usage also appears in popular cultural entertainment. *See, e.g.*, OLD SCHOOL, (Dreamworks
Pictures 2003) Youtube Excerpt (You're my boy, Blue!"), https://perma.cc/QF39-CUL5 (last visited Nov 16,
2023); PARKS AND RECREATION, Season 2, Episode 17 (2010) ("I want to meet your boy."),
https://perma.cc/8DUQ-PSKV (last visited Nov 16, 2023).

come before you and had an opportunity to slant his testimony to get you to buy into his version of events because he wants you to believe that he went over on June 27th. He's partying it up with his boy, Corey Miller. They're going to celebrate, but we have a vague plan to go pick up a child and then go party with them.

(Trial. Tr. Vol. 2 at 465.) The Government's remark seems intended to undermine Mr. Cornelius's testimony: that his story was implausible because no one would be picking up a child at 2 a.m. and taking her along to "party." Similarly, the prosecution's theory was that Mr. Cornelius placed himself at Huey Street intentionally, not by happenstance, so he brought the gun with him as a show of force. These statements weren't inappropriate; they are consistent with the Government's theory of the case, and they don't warrant a declaration of a mistrial or a new trial.

### 2. *Renewed Motion under Rule 29*

The Court has previously denied Mr. Cornelius's motion for acquittal under Federal Rule of Criminal Procedure 29, finding that there was sufficient evidence, when viewed in the light most favorable to the Government, from which the Jury could determine that he possessed the guns both in May 2020 and June 2021 prior to the presence of a threat that would support a theory of self-defense. Mr. Cornelius is not challenging that ruling here. Instead, in his renewed motion under Rule 29, Mr. Cornelius is asking for judgment of acquittal on the grounds that he has successfully presented affirmative self-defense claims as to both the 2020 and 2021 incidents and that he has successfully presented a public authority defense as to the first incident. He claims that uncontroverted evidence from Mr. Cornelius and Mr. Miller establishes that in both instances the contemporaneous threats to his life prompted his brief possession of the firearms. In addition, he insists that after the May 2020 shootout, after taking down the serial number for the Smith & Wesson, Sgt. Daley instructed him to keep the firearm until someone from the South

Bend Police Department called to retrieve it. Mr. Cornelius has not cited a single point of authority in support of his position.

> "[U]nlike a typical challenge to the sufficiency of the evidence, [a] defendant's burden is even greater" where, as here, he contends that acquittal is warranted based on an affirmative defense. *United States v. Waagner*, 319 F.3d 962, 964 (7th Cir. 2003). To prevail on such a claim, the defendant must show that the evidence, even when viewed in the light most favorable to the Government, is "so one-sided" that a rational jury could not reach "any decision [other than] a finding of not guilty" based on the defense asserted. *Id*.

*United States v. Dvorkin*, 799 F.3d 867, 879–80 (7th Cir. 2015).

As explained in the Court's earlier order, there was sufficient evidence at trial from which the Jury could find Mr. Cornelius guilty beyond a reasonable doubt. (Op. & Order, DE 71.) Even now, the Government's case is largely undisputed, with Mr. Cornelius himself acknowledging that he possessed the firearm on both occasions; instead he claims that he possessed the firearm in response to unlawful threats or pursuant to a grant of public authority. Yet his affirmative defenses are far from being "so one-sided" so as to require an acquittal.

At trial, the Court instructed the jury as to Mr. Cornelius's self-defenses. The Court told the jurors that, if the Government proved each element of the charged offenses, they should find him guilty "unless the defendant has proved that it is more likely than not that he was acting in self-defense at the time of the crime charged. In that case you should find the defendant not guilty of this charge." (Final Jury Instructions, DE 70 at 17, 19.) The Court then explained the elements of Mr. Cornelius's self-defenses:

> To establish that he was acting in self-defense at the time of the crime charged, defendant must prove that each of the following elements is more likely true than not true. This is a lesser burden of proof than the Government's burden to prove beyond a reasonable doubt each element of the charged offense in Count 1.
>
> 1. He, or another person, was under an unlawful and present threat of death or serious bodily injury;

2. He did not recklessly place himself in a situation where he would be forced to unlawfully possess a firearm;

3. He had no reasonable legal alternative (to both possessing a firearm and the avoidance of the threatened harm);

4. There was a direct causal relationship between possessing a firearm and avoidance of the threatened harm; and

5. He abandoned the firearm at the earliest possible opportunity after the threat had passed.

(*Id.* at 17–18; 19–20.)

However, Mr. Cornelius' theories of self-defense aren't even in play if he possessed the firearm on May 13, 2020, before the onset of the emergency and if the rifle he possessed on June 27, 2022, was his own, and not a rifle purportedly snatched from an assailant. As explained above, the jury could infer from the speed with which Mr. Cornelius managed to respond to the drive-by shooting that he did not retrieve the gun from his sister-in-law's purse but had it in his possession—ready and loaded—even before the threat became evident. Moreover, Mr. Cornelius did not tell the responding sergeant that the gun belonged to his sister-in-law. And, according to Detective Martinsky, when he called Mr. Cornelius to retrieve the gun, Mr. Cornelius said he still had it and said nothing about it being owned by his sister-in-law. Likewise, Mr. Cornelius's account of how he obtained the rifle on June 27, 2021, was undermined by his statements to the officers about having a "license" and the cost of the ammunition. The Jury could have reasonably construed those statements as indicating his ownership of the gun. Therefore, Mr. Cornelius's motion for acquittal as a matter of law must be denied.

### D.  Conclusion

For these reasons, the Court DENIES Mr. Cornelius's motion for mistrial or new trial (DE 63) and DENIES his renewed motion for judgment of acquittal under Rule 29 (DE 83).

SO ORDERED.

ENTERED: November 29, 2023

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court