UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

UNITED STATES OF AMERICA

v.                                                  Case No. 3:21-CR-90 JD

LEONTIS CORNELIUS

## OPINION AND ORDER

On June 27, 2021, South Bend police were responding to a disturbance when they saw

Defendant Leontis Cornelius carrying a rifle. Subsequently, the State of Indiana charged him

with unlawful possession of a firearm by a serious violent felon. During the criminal

proceedings, the state prosecutors disclosed to Mr. Cornelius's attorney a forensic report about a

latent print found on the rifle. The state case was dismissed after Mr. Cornelius was charged in

federal court, with representation by different counsel. Unaware of the report, the Government

failed to provide it to the defense in discovery. Mr. Cornelius was tried before a jury and was

convicted of two counts of being a felon in possession of a firearm.[1] He now claims that he

learned after trial of the forensic report and believes that the Government's failure to provide it

violated his rights under the Fifth Amendment to the United States Constitution. Accordingly,

Mr. Cornelius moved under *Brady v. Maryland*, 373 U.S. 83 (1963), for a new trial, or, in the

alternative, for a new trial under Federal Rule of Criminal Procedure 33. For the reasons below,

the Court will deny the motion.

### A. Background

---

[1] Mr. Cornelius was tried on two charges of being a felon in possession of a firearm. The first offense took place in May 2020, but only the second offense—committed on June 27, 2021, is pertinent to this order.

On June 27, 2021, South Bend police responded to a location on Huey Street regarding a disturbance. When they arrived, they saw Mr. Cornelius coming from behind a house holding a rifle. Because Mr. Cornelius had been previously convicted of various felonies, the state of Indiana charged him in St. Joseph Superior Court, in Case No. 71, D01-2106-F4-32, with unlawful possession of a firearm by a serious violent felon. Mr. Cornelius retained attorney Michael Tuszynski.

On September 14, 2021, Lacie Klosinski, a fingerprint examiner at the South Bend Police Department crime lab, issued a report concerning the single latent print found on the rifle's scope cover flap. The report stated that the latent print was compared to Mr. Cornelius's livescan fingerprint and palm print impressions,[2] the exemplar, without success; as well, the submission of the latent prints to AFIS ("Automated Fingerprint Identification System") yielded "no hits":

RESULTS OF EXAMINATION:

. . .

Contained 1 partial latent print suitable for comparison and limited entry into AF/5. The print was labeled "01" for reference. Print "01" was compared insofar as possible to Livescan fingerprint and palm print impressions of Cornelius, Leontis SBPD #117515; no individualizations were made. The palm print exemplars for Cornelius were insufficient for a complete comparison as the entire interdigital area of both palms were missing. Print "01" was entered insofar as possible into AFIS as a finger and a palm print; no hits were received.

Nothing further at this time.

(Def.'s Ex. B, Klosinski Report, DE 111-2.)

---

[2] Livescan is an inkless electronic scan of a person's prints. *Cf.* Illinois State Police Bureau of Identification, Live Scan, https://isp.illinois.gov/BureauOfIdentification/LiveScan ("Live scan is an inkless electronic system designed to capture an individual's fingerprint images and demographic data (name, sex, race, date of birth, etc.) in a digitized format that can be transmitted . . . for processing.") (last visited August 15, 2024).

As part of the pretrial procedures, the state prosecutor disclosed the September 14, 2021, report to Mr. Tuszynski. (*See* Def.'s Ex. C, DE 111-3.) However, the state case was dismissed after the federal grand jury charged Mr. Cornelius with being a felon in possession of a firearm.

In federal court, Mr. Cornelius proceeded to a jury trial where the Government presented the following evidence:

Around 2 a.m., on June 27, 2021, South Bend Police Officer Garrett Payne was called to a house on Huey Street to investigate a disturbance. (Trial Tr. Vol. 1 at 163–164.) When Officer Payne arrived, he found Mr. Cornelius walking from behind a house to the front yard and carrying a rifle. (*Id.* at 166.) Officer Payne asked him, "What's going on?" and, upon seeing the gun, yelled, "drop it, drop it, drop it." (*Id.* at 166–69, Gov't Ex. 1, Payne's Body Camera Video at 0:20–30.) Mr. Cornelius dropped the weapon and responded, "I've got a license. I've got a license." (Trial Tr. vol. 1 at 166–167, 170, 181; Gov't Ex. 1, Body Camera Video at 0:30–3). Mr. Cornelius also told Officer Payne that no one else was in the house, he did not live there, there were no other guns in the house, and that this was a "child dispute." (Trial Tr. Vol. 1 at 167–168; Gov't Ex. 1, Body Camera Video at 0:40-1:02; 1:25-30.) A moment later, Mr. Cornelius continued: "You good, you good, bro" (Gov't Ex. 1, Body Camera Video at 1:10-17), and "[i]t is nothing, I promise you. Y'all good" (*id.* at 1:30-40).

Officer Payne told another officer, Shawn Fredenburg, to get the rifle. (Trial Tr. Vol. 1 at 180–181; Gov't Ex. 2, Fredenburg body camera video.) Officer Fredenburg picked up the rifle and started clearing it to unload the ammunition. Seeing this, Mr. Cornelius exclaimed, "Please don't do that. Don't do that. That's $40 a round. Don't do that. That's $40 a round." (Trial Tr. Vol 1 at 188; Gov't Ex. 2, Fredenburg body camera video at 0:35-42.) Officer Fredenburg testified that, when he responded to the call, he believed someone was holding a gun to a

person's head. (Trial Tr. Vol. 1 at 179.) But there was no evidence at trial to explain the basis of that belief. In his interactions with the two officers, Mr. Cornelius said nothing about "somebody holding a gun to his head" or about him "wrestling the gun away from another person."[3] (*Id.* at 176.) The Government presented no forensic evidence regarding possession of the rifle.

During his case-in-chief, Mr. Cornelius offered through his own testimony and the testimony of his friend, Corey Miller, the affirmative defense of self-defense. Mr. Miller testified that he was partying with Mr. Cornelius on the night of June 27 when Mr. Cornelius told him that they should continue the party elsewhere. (*Id.* at 299–300.) Mr. Miller's girlfriend was also with them, and she had to visit or pick up her daughter at a house on Huey Street. As a result, Mr. Miller, his girlfriend, and Mr. Cornelius drove there. (*Id.* at 300–301.) When they arrived, Mr. Miller and his girlfriend got out of the vehicle and an argument ensued between them and the father of the girlfriend's daughter. (*Id.* at 306.) Hearing the argument, Mr. Cornelius joined the group, and at this moment a man with a rifle came from around the house. The man stood three feet away from Mr. Miller and Mr. Cornelius and pointed the rifle to their heads. Mr. Cornelius snatched the rifle out of the man's hands and the man ran behind the house. (*Id.* at 307–309.) Mr. Miller testified that Mr. Cornelius dropped the rifle "as soon as he snatched it" and just as the police pulled up. (*Id.* at 328.) When police arrived, Mr. Miller did not tell them about the man holding a gun to their heads. (*Id.* at 322.)

Mr. Cornelius's testimony was similar to Mr. Miller's. He testified that he heard a commotion and got out of the truck. Suddenly, a man appeared and pointed a rifle to his head. Mr. Cornelius instinctively grabbed the rifle and the man ran away. (*Id.* at 360–362.) Mr. Cornelius went looking for the man and dropped the rifle behind the house before the officers

---

[3] As noted below, Mr. Cornelius testified to this effect at trial.

showed up. (*Id.* at 363.) In response to the testimony of police officers, Mr. Cornelius said his comment about having a license "was me saying that, as like, I can identify who I am." (*Id.* at 364, 392.) He also said that it did not make sense for him to comment on the price of the bullets because "there's no way that you going to find a round that cost $40." (*Id.* at 364.) He attributed these misstatements to his intoxication. (*Id.* at 393–94.)

During the closing argument, the Government recounted its evidence, contrasting it to the testimony of Mr. Cornelius and Mr. Miller. Among other things, the Government argued—over Mr. Cornelius's objection—that Mr. Cornelius brought the rifle to the house on Huey Street as opposed to wrestling it away from some unknown individual. On the other hand, Mr. Cornelius's counsel argued that he acted in self-defense and possessed the firearm only momentarily as was necessary to avert the danger. The Jury found Mr. Cornelius guilty of possessing a firearm as a felon, as charged in Count 2 of the superseding indictment. (Jury Verdict, DE 67 at 2.)

About two months after the trial, one of Mr. Cornelius's lawyers emailed his state court attorney, Mr. Tuszynski, asking whether he received any fingerprint analysis of the rifle from the state prosecutor:

> During your state representation of Mr. Cornelius, did you by any chance receive any fingerprint analysis for the AR-15 from the state prosecuting authorities? We are seeking any discovery related to other person(s) who the state authorities may have found to have possessed the AR-15 or fingerprint analysis showing that unknown person(s) may have possessed the AR-15 other than Mr. Cornelius.

(Def.'s Ex. C, DE 111-3.) In response to the inquiry, Mr. Tuszynski supplied the report noted above, after which Mr. Cornelius filed his motion.

The Court held an evidentiary hearing on the issues raised in the motion. During the hearing, Ms. Klosinski testified that her findings regarding the latent print from the front cover of the scope of the AR-15 rifle were inconclusive. (Hearing Tr., DE 126 at 16, 22.) She said she

never determines how or when prints are left on an item and didn't make such a determination

here either. (*Id.* at 29.) She testified that the latent print did not match Mr. Cornelius's fingerprint

but that she could not compare the latent print to Mr. Cornelius's palm print, because that

exemplar was incomplete (*id.* at 12–13): the palm prints of Mr. Cornelius were incomplete (*id*. at

14). She said she submitted the latent print to the AFIS local database but received no suitable

candidates for comparison. (*Id*. at 15, 17.) While Ms. Klosinski thought that the latent print was

suitable for purposes of her own comparison, she did not think that it was of such a quality for

her to enter it into the AFIS national database. (*Id*. at 31.) Ms. Klosinski testified she was 75%

sure that the latent print was a palm print based on the pattern of the print. (*Id.* at 31-32.) In

summary, Ms. Klosinski could not exclude Mr. Cornelius as the contributor of the latent print or

draw any conclusion from the comparison, such as that the print belonged to someone else. (*Id.*

at 16, 22.)

Following the hearing, Mr. Cornelius retained Speckin Forensics LLC to review Ms.

Klosinski's findings. Speckin Forensics assigned the task to Michael Sinke. On May 14, 2024,

the defense received Mr. Sinke's findings. According to Speckin Forensics, Mr. Sinke's

conclusions align with Ms. Klosinski's, albeit with slight variation:

1. The latent print is eliminated as having been made by the fingerprints of Leontis Cornelius.
2. The latent print cannot be identified with the palm prints of Leontis Cornelius, but it also cannot be eliminated due to incomplete inking of the palm prints.
3. [Mr. Sinke] cannot disagree with the testimony of Lacie Klosinski. The latent print could be from the interdigital area of the palms below the fingers which is missing on the palm print cards.
4. To achieve a complete elimination of the latent print another complete set of inked palm prints needs to be obtained.
5. By positively eliminating the latent print it would be concluded that another person touched the weapon perhaps giving credence to the idea that someone else possessed the weapon first.

(Speckin Forensics Email, Def.'s Ex. A, DE 134-1.)

Before Mr. Cornelius submitted to the Court Mr. Sinke's opinions, the government filed a notice of other facts. In its notice, the Government claims that Mr. Cornelius knew of Ms. Klosinski's report long before trial. The Government submitted two jail phone call recordings of Mr. Cornelius discussing the criminal case against him with his wife and later with an unknown individual.[4]

Mr. Cornelius called his wife on November 12, 2022, two weeks after moving to suppress his statements to the police. During the roughly fifteen-minute conversation, he also discussed the federal case:

> Mr. Cornelius: Uh, now, you know what I mean? They moved it back so, you know what I mean? Because I put in, you know what I mean, got the motion of suppress to go in, so, you know what I mean? I got 30 days to, they got 30 days to reply to my, uh, motion to suppress. And then I got a 30 day, I got 30 days to rebut their, uh, their reply and they vacate. You know what I mean? My, uh, my trial of, you know what I mean, on December 5th, so you know what I mean. Right now it is, you know what I mean? You know the, I'm just, I'm waiting on the motion of the motion to suppress and the whole thing is, you know what I mean? Everything with the motion of suppress is all law, so, you know what I mean? You really can't get around it, you know what I mean? So they going have to suppress damn near all of the evidence that they got. So.

> Mr. Cornelius's Wife: Um, I was gonna say, what, what, what are they charging you with?

> Mr. Cornelius: Uh, they're charging me with a 922(g), with just a simple possession.

> Mr. Cornelius's Wife: 922(g).

> Mr. Cornelius: Yep. Just simple possession.

> Mr. Cornelius's Wife: Lemme see. Um, because Chris is asking.

> Mr. Cornelius: Yeah. Yeah. Just simple possession, you know what I mean? Um, not only that, you know what I mean? They simple possession, no fingerprints on

---

[4] At the beginning of both calls, an automatic prompt advises the participants that their conversations are being recorded.

nothing, no DNA attached to nothing. Um, they didn't see me with nothing, you know what I mean? It's --

Mr. Cornelius's Wife: Hold on.

Mr. Cornelius: What?

Mr. Cornelius's Wife: You keep on talking. I was speaking out loud. Oh. Trying to find Chris, um, text that he sent right here. Okay. Simple possession?

Mr. Cornelius: Yeah.

(Gov't Notice of Additional Facts, DE 131 at 5–6.)

Two weeks after the trial, on May 26, 2023, Mr. Cornelius called an unidentified person and spoke, among other things, of the absence of his fingerprints on the rifle:

Mr. Cornelius: There. The video footage shows that I didn't have no gun, no, no big ass gun in my hand or no gun in my hand at all. There's no fingerprints of mine on the m***********g gun or DNA on the gun. There is, you know what I mean? The witness is testifying to where the location of where the gun was at and how the gun got there. You know what I mean? I'm at the back of the house, you know what I mean? The gun is at the, is found at the front of the house. When they, they got camera footage, they got footage, video footage of me coming from the back of the house. Never with no gun in my hand. They got video footage of them picking the gun up from in front of the house. How did the gun get there? My fingerprints ain't on it. How did the gun get there? You had footage, you got video footage of me with no gun in my hand. How did the gun get there? Come on man. But you find me guilty of this s**t. The reason why you found me guilty is because you already had you, you, you, you, you, y'all dressed the situation up. You know what I mean? And every time I tried to bring this up, you know what I mean? Y'all sit up and you know what I mean? Y'all are try to play the play the role. I'm steady telling them, you know what I mean? There's no fingerprints for me. There's, but there is fingerprints on that m*********r and it ain't mine or nobody that's —.

Phone Recording System: You have one minute remaining.

Mr. Cornelius: Or nobody associated to me.

(*Id.* at 7 (edits added).)

Again, about five weeks after this phone call, one of Mr. Cornelius's attorneys contacted Mr. Tuszynski which resulted in Mr. Cornelius filing a motion for a new trial under *Brady* or, in the alternative, under Rule 33.

## B.  Standard of Review

The Government has an obligation to disclose evidence favorable to the defendant and material either to guilt or punishment:

> The Fifth Amendment's due process clause mandates the prosecution disclose "evidence favorable to an accused . . . where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. This disclosure duty applies in the absence of a defendant's request for such evidence and includes both exculpatory and impeachment evidence. "To succeed on a Brady claim, a defendant bears the burden of proving that the evidence is (1) favorable, (2) suppressed, and (3) material to the defense. Evidence is material within the meaning of Brady when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.
>
> *Dekelaita v. United States*, __ F.4th __, 2024 U.S. App. LEXIS 18181, *19–20 (7th Cir.

July 24, 2024) (quotations and citations omitted). "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995); *see also*, *United States v. Wilson*, 237 F.3d 827, 832 (7th Cir. 2007) (agreeing with the defendant that it is proper to impute to the prosecutor's office facts that are known to the police and other members of the investigation team).

When determining whether there's a reasonable probability that the disclosure of the evidence would have changed the result of the trial, the courts ask "whether in [the absence of the suppressed evidence, the defendant] received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A 'reasonable probability' of a different result is accordingly

shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *United States v. Gillaum*, 372 F.3d 848, 858 (7th Cir. 2004) (quoting *Kyles*, 514 U.S. at 434). "[T]he effect that a particular piece of evidence is likely to have had on the outcome of a trial must be determined in light of the full context of the weight and credibility of all evidence actually presented at trial. Having personally observed the entire proceeding, the district court judge is best positioned to make this determination." *United States v. Silva*, 71 F.3d 667, 670 (7th Cir. 1995).

The Court may also grant a new trial under Federal Rule of Criminal Procedure 33(a), "[u]pon the defendant's motion . . . if the interest of justice so requires." "Courts have interpreted Rule 33 to require a new trial 'in the interest of justice' in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989). Even so, there are significant limitations. Granting a motion for a new trial "is reserved for only the most extreme cases." *United States v. Peterson*, 823 F.3d 1113, 1122 (7th Cir. 2016); *see also United States v. Coscia*, 4 F.4th 454, 465 (7th Cir. 2021) (noting that the courts approach motions for new trial with great caution and are wary of second-guessing jury determinations). "A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) (quoting *United States v. Morales*, 902 F.2d 604, 605 (7th Cir. 1990), *amended on other grounds*, 910 F.2d 467 (7th Cir. 1990)). "The ultimate inquiry is whether the defendant was deprived of a fair trial." *United States v. Friedman*, 971 F.3d 700, 713–14 (7th Cir. 2020) (quoting *United States v. Lawrence*, 788 F.3d 234, 243 (7th Cir. 2015)). In considering a motion for a new trial, "a court may properly consider the credibility of the witnesses, and may grant a new trial if the verdict is so contrary to the weight of

the evidence that a new trial is required in the interest of justice." *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999). In doing so, "the court considers whether the verdict is against the manifest weight of the evidence, taking into account the credibility of the witnesses." *Id*.

### C. Discussion

#### (1) *Mr. Cornelius's Motion under* **Brady**

Mr. Cornelius argues that he should be granted a new trial because the Government did not disclose the fingerprint and palm print comparison summary which was material evidence to his affirmative defense of self-defense. He insists that, had this information been available, there's a reasonable probability that the trial result would have been different. According to Mr. Cornelius, "the non-disclosed print evidence undermines confidence in the May 2023 trial outcome." (Def.'s Br., DE 134 at 4.) This is because the latent print did not match Mr. Cornelius's fingerprint exemplar, and the palm print evidence, while inconclusive, did not rule out that another person was the source of the print and thus possessed the firearm. Mr. Cornelius submits that such evidence undermines the Government's argument to the Jury that he brought the gun to the Huey Street location.

Mr. Cornelius insists that he did not know about Ms. Klosinski's report and had no reason to wonder if there was fingerprint or palm print evidence because the Court's discovery order required the Government to disclose such evidence in the first place. Mr. Cornelius argues that he should not have to second-guess the Government about the evidence it possesses. Finally, Mr. Cornelius contends that the jail phone calls, when considered in context, do not establish that he knew anything about the forensic evidence before his trial.

In its response, the Government agrees that it did not disclose Ms. Klosinski's report. The failure was inadvertent because the Government's counsel did not know of the report due to "miscommunications." (*See* Gov't Br., DE 119 at 6, n.2.) However, it argues that the jail phone calls show that Mr. Cornelius knew about this evidence, or that, at the very least, the knowledge of this evidence should be imputed to him through his lawyer, Mr. Tuszynski, who received the report from the state prosecutor. The Government also argues that Mr. Cornelius's lawyers failed to exercise due diligence or they would have discovered the report.

The Government also maintains that the report was not material because it was inconclusive and thus could not have affected the outcome of the trial. The report does not corroborate that someone else held the gun nor does it tend to show that Mr. Cornelius didn't possess it. And even if someone else did hold the gun, the report has nothing to say about when that would have been. Had the report been admitted into evidence, the Jury would have been left to speculate about its meaning. Besides, according to the Government, the entirety of the trial evidence makes the evidence inconsequential.

With the parties' positions identified, the Court can proceed to its analysis, starting with the question of whether the Government suppressed evidence. "Evidence is suppressed when 'the prosecution fail[s] to disclose the evidence in time for the defendant to make use of it' and 'the evidence was not otherwise available to the defendant through the exercise of reasonable diligence.'" *United States v. Shields*, 789 F.3d 733, 746–747 (7th Cir. 2015) (quoting *Ienco v. Angarone*, 429 F.3d 680, 683 (7th Cir. 2005)). "[E]vidence cannot be said to have been suppressed in violation of *Brady* if it was already known to the defendant." *Avery v. City of Milwaukee*, 847 F.3d 433, 443 (7th Cir. 2017).

There is no dispute that the Government inadvertently failed to disclose Ms. Klosinski's report to the defense.[5] The Government argues, however, that Mr. Cornelius independently knew about the forensic report because it had been disclosed to Mr. Tuszynski during the state court proceeding. To show such knowledge the Government is relying on Mr. Cornelius's two phone calls from the jail. In the alternative, the Government submits that, even if Mr. Cornelius himself did not know about the evidence, Mr. Tuszynski's knowledge about the report can be imputed to Mr. Cornelius in any case. Neither argument is persuasive.

On November 12, 2022, two weeks after filing a motion to suppress, Mr. Cornelius called his wife from the St. Joseph County Jail. At one point during this fifteen-minute conversation, he vaguely referred to fingerprints: "Yeah. Yeah. Just simple possession, you know what I mean? Um, not only that, you know what I mean? They simple possession, no fingerprints on nothing, no DNA attached to nothing. Um, they didn't see me with nothing, you know what I mean? It's––." (Gov't Notice of Additional Facts, DE 131 at 6.) While it's easy to imagine that Mr. Cornelius is referring to Ms. Klosinski's report, he appears to have spoken about his case in general terms. Because the Government had produced no fingerprint reports, it is just as likely that Mr. Cornelius was pointing out this void in the evidence. In other words, Mr. Cornelius was likely summarizing the evidence as it was known to him, based on discovery issued by the Government, and which included no fingerprints or DNA evidence. Given the absence of the forensic evidence, he appears to have thought that the Government's case against him was weak. Mr. Cornelius did not refer to the state prosecution or discovery produced in the state's case. So to infer from his passing comment about the lack of fingerprints that he knew about the forensic

---

[5] Of course, as the Government itself acknowledges, its good faith is irrelevant under the *Brady* analysis. *See Brady*, 373 U.S. at 87.

report would amount to speculation.[6] *Cf. Gupta v. Melloh*, 19 F.4th 990, 997 (7th Cir. 2021) (noting in the context of a motion for summary judgment that "a court need not give credence to facts based on speculation or conjecture").

      The second phone call is more favorable to the Government's theory but even that conversation falls short of showing that Mr. Cornelius knew about the report before his trial. While the second phone call may suggest that Mr. Cornelius knew about the report by May 26, 2023 (the day the phone call was made), seventeen days after the trial, there's nothing showing that he had obtained this information before the trial. Here's the relevant portion of the conversation:

> There. The video footage shows that I didn't have no gun, no, no big ass gun in my hand or no gun in my hand at all. There's no fingerprints of mine on the m***********g gun or DNA on the gun. There is, you know what I mean? The witness is testifying to where the location of where the gun was at and how the gun got there. You know what I mean? I'm at the back of the house, you know what I mean? The gun is at the, is found at the front of the house. When they, they got camera footage, they got footage, video footage of me coming from the back of the house. Never with no gun in my hand. They got video footage of them picking the gun up from in front of the house. How did the gun get there? My fingerprints ain't on it. How did the gun get there? You had footage, you got video footage of me with no gun in my hand. How did the gun get there? Come on man. But you find me guilty of this s**t. The reason why you found me guilty is because you already had you, you, you, you, you, y'all dressed the situation up. You know what I mean? And every time I tried to bring this up, you know what I mean? Y'all sit up and you know what I mean? Y'all are try to play the play the role. I'm steady telling them, you know what I mean? There's no fingerprints for me. There's, but there is fingerprints on that m**********r and it ain't mine or nobody that's — . . . Or nobody associated to me.

(*Id.* at 7 (edited with asterisks).)

---

[6] In addition to reading the transcript, which Mr. Cornelius does not contest, the Court also listened to the audio-recording of the phone call, and it cannot discern anything from the manner of Mr. Cornelius's speaking that would suggest his knowledge of Ms. Klosinski's report.

In this conversation, Mr. Cornelius is referring to fingerprints which he maintains aren't his and that he had tried to bring this up with "them," which does suggest that, at least by then, he knew of the forensic report. But there's nothing in what he said that would suggest that he had this information at the time of trial. The Government insists that, at the very least, the two phone calls, when considered together, show Mr. Cornelius's knowledge. But the Court is not convinced. At most, Mr. Cornelius knew about Ms. Klosinski's report by May 26, 2023, but there's no telling when he first obtained this information. Simply put, the Government's evidence is insufficient.

Next, the Government argues that, even if Mr. Cornelius did not know of the report, such knowledge can be imputed to him because Mr. Tuszynski, his attorney in state court, was provided this information. In support of its position, the Government cites a single case, *New York v. Hill*, 528 U.S. 110 (2000), but does not analyze the issue in question. The Government thus waived this argument. *See Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 569 (7th Cir. 2004) ("An undeveloped argument constitutes waiver. A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority, forfeits the point.") In any event, *Hill* does not control this case.

In *Hill*, the defendant was extradited from Ohio to New York to face murder and robbery charges. Defense counsel agreed to a trial date set beyond the 180-day statutory period required by the Interstate Agreement on Detainers ("IAD"). The defendant then moved to dismiss the indictment for lack of a timely trial, but his motion was denied because "defense counsel's explicit agreement to the trial date set beyond the 180 day statutory period constituted a waiver or abandonment of defendant's rights under the IAD." *Hill*, 528 U.S. at 113. The case reached the United States Supreme Court on a question of whether defense counsel's agreement to a trial

date outside the IAD period bars the defendant from seeking dismissal on the ground that trial did not occur within that period. The Supreme Court sided with the trial judge, finding that the defendant was bound by his attorney's agreement. *Hill* thus was concerned with the question of whether an attorney can waive a statutory period, not with the knowledge of discovery being imputed to the defendant. Even then, the Supreme Court noted that "[w]hat suffices for waiver depends on the nature of the right at issue." *Id*. at 114. For certain fundamental rights, such as right to counsel or right to plead not guilty, the defendant must personally make an informed waiver. *Id.* For other rights, attorneys may have full authority to act on their own. Therefore, a particularized discussion is necessary to identify the right at issue and the corresponding scope of the attorney's authority to act on the defendant's behalf. As noted already, the Government's brief has no such discussion. What's more, *Hill* did not involve a motion under *Brady* nor an attorney who was representing the defendant in a *different* criminal prosecution. As a result, and without further explanation from the Government, it's difficult to see how *Hill* applies to Mr. Cornelius's situation. On the facts here, the Court is not willing to find that Mr. Tuszynski's knowledge obtained in the state court proceeding can be imputed to Mr. Cornelius while he was being prosecuted in federal court.

As its final argument on suppression, the Government submits that Mr. Cornelius's attorneys failed to exercise due diligence by failing to uncover Ms. Klosinski's report. But the Government's argument assumes that Mr. Cornelius or his attorneys knew about the report. (*See* Gov't Br., DE 119 at 6–9 (citing *Avery v. City of Milwaukee*, 847 F.3d 433, 443 (7th Cir. 2017) ("[E]vidence cannot be said to have been suppressed in violation of *Brady* if it was already known to the defendant."); *United States v. Torres*, 129 F.3d 710, 717 (2d Cir. 1997) (no *Brady* violation where the undisclosed evidence was provided to defendant's former attorney in the

same case); *United States v. Edwards*, 34 F.4th 570, 587 (7th Cir. 2022) ("Though the government did not produce the report, anything Edwards would have gained from it was available to him through reasonable diligence because Burrell was his witness.").) Yet as explained above, there is no convincing evidence that Mr. Cornelius, or his current attorneys, knew or should have known about the report, and the Government has not explained why they should have at least suspected its existence. As Mr. Cornelius demonstrated in his brief, the Government regularly discloses forensic evidence before trials, so it was not out of the ordinary for Mr. Cornelius and his attorneys to assume no such evidence existed. Without a showing that there was a reason for the defense to ask about the forensic evidence, the Court cannot accept the Government's theory that Mr. Cornelius's attorneys failed to exercise due diligence.

In the end though, this does not matter because Ms. Klosinski's report was not material to any issue at trial.[7] To determine whether evidence is material, the Court must ask "what purpose the evidence would have served and how it might have affected the jury's view of the evidence that was introduced." *Toliver v. McCaughtry*, 539 F.3d 766, 780 (7th Cir. 2008). In doing so, the Court weighs whether the "government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Gillaum*, 372 F.3d at 858 (quoting *Kyles*, 514 U.S. at 434). The omission, of course, must be evaluated in the context of the entire record. *United States v. Agurs*, 427 U.S. 97, 112 (1976).

Ms. Klosinski's report states that the partial latent print—likely a palm print— was a suitable comparison and that it was compared to Mr. Cornelius's livescan fingerprint and palm

---

[7] In their briefs, the parties skip the first prong of the *Brady* test—whether the evidence was favorable to Mr. Cornelius, that is, whether "it is exculpatory or impeaching," *United States v. Edwards*, 34 F.4th at 587—but the Court will not address this prong separately because the lack of materiality and favorability are closely intertwined in this case.

print impressions. However, no individualizations were made. "The palm print exemplars for Cornelius were insufficient for a complete comparison as the entire interdigital area of both palms were missing." (Def.'s Ex. B, Klosinski Report, DE 111-2.) And although the latent print was entered into the local AFIS database as a finger and a palm print, no matches were returned.

At the evidentiary hearing, Ms. Klosinski further explained that her findings regarding the latent print from the front cover of the scope of the AR-15 rifle were inconclusive. (Hrg. Tr., DE 126 at 16, 22.) Ms. Klosinski could not compare the latent print to Mr. Cornelius's exemplar palm prints because the exemplar prints were incomplete given that the palm print areas of Mr. Cornelius's exemplar prints were missing (*id.* at 12–14). Ms. Klosinski could not determine whether the latent print was a fingerprint or a palm print, but she was 75% sure that it was a palm print based on the pattern of the print. (*Id.* at 31–32.) As a result, Ms. Klosinski could not determine whether the latent print was deposited by Mr. Cornelius or someone else. (*Id.* at 16, 22.)

Mr. Sinke's findings resemble Ms. Klosinski's. He found that the latent print was not deposited by Mr. Cornelius's fingerprints, but he could neither identify the latent print as matching Mr. Cornelius's palm print nor eliminate that as a possibility because the exemplar palm prints were incomplete. The Speckin Forensics report states that "[Mr. Sinke] cannot disagree with the testimony of Lacie Klosinski. The latent print could be from the interdigital area of the palms below the fingers which is missing on the palm print cards." (Def.'s Ex. A, Speckin Forensics Report, DE 134-1.) Mr. Sinke states that "[t]o achieve a complete elimination of the latent print another complete set of inked palm prints needs to be obtained." (*Id.*)

Since both experts agree that the comparison is inconclusive, Ms. Klosinski's report is not material to the case. By invoking the defense of self-defense, Mr. Cornelius necessarily

admitted that he possessed the firearm. Therefore, the only relevance of the latent print is to corroborate Mr. Cornelius's claim at trial that someone else had the gun before he snatched it away in self-defense. But neither Ms. Klosinski nor Mr. Sinke can lend to that conclusion. While Mr. Sinke eliminated Mr. Cornelius's fingers as depositors of the latent print, he could not conclude that the print wasn't his because of the incomplete palm print exemplar. In turn, Ms. Klosinski could not say whether the latent print was Mr. Cornelius's or somebody else's. (Hrg. Tr., DE 126 at 17.) Mr. Cornelius keeps stressing the fact that his fingerprints did not match the latent print but ignores the fact that Ms. Klosinski was 75% sure that the latent print was a palm print. Mr. Cornelius also overlooks that his own expert "cannot disagree with the testimony of Lacie Klonsinski." (Speckin Forensics Report, DE 134-1.) Such an inconclusive report was of no value to Mr. Cornelius as it neither tended to prove nor disprove his defense. In other words, had it been entered into evidence, everything else would have remained the same. *See, e.g., United States v. King*, 150 F.3d 644, 651 (7th Cir. 1998) (noting that a fingerprint on a paper item, located in the vicinity where the bank robber's getaway car may have been parked, that has not been positively identified as not belonging to the defendant, cannot be said to be favorable evidence); *see also Aldrich v. Bock*, 327 F. Supp. 2d 743, 757 (E.D. Mich. 2004) ("Inconclusive test results do not have a tendency to make the existence of any consequential fact more or less probable and, therefore, the test results are not relevant."); *see also United States v. Hagler*, 2011 U.S. Dist. LEXIS 59097, *13 (N.D. Ind. June 2, 2011) (". . . DNA evidence that is inconclusive does not aid in [the defendant's] claim of innocence.").

Mr. Cornelius argues that the presence of a print on the scope flap supports his affirmative defense, and is consistent with the testimony of Mr. Cornelius and Mr. Miller. By his logic, if he grabbed the rifle at the front of the barrel, as they testified, the print on the scope flap

suggests possession by someone else, like his alleged assailant. But this argument is fraught with shortcomings. The absence of a print on the front barrel of the rifle might just as easily suggest to a jury that Mr. Cornelius didn't possess the rifle as he claimed, calling into question his testimony. As well, given the video evidence and how it reflects the possession of the rifle by Mr. Cornelius - something more substantial than an isolated possession of the barrel - the jury could have just as easily concluded that the print on the scope flap could be that of Mr. Cornelius. So, it seems any inferences from the forensic report could have just as easily undermined the theory of defense. *See e.g., Jones v. United States*, 231 F. App'x 485, 488 (7th Cir. 2007) (observing that, even if the forensic report that the defendant was hoping to obtain in discovery showed that only the fingerprints of a cohort were present on the firearm, that would be insufficient to prevail on a *Brady* claim because such evidence is not exculpatory; the cohort's prints would suggest only that the cohort possessed the gun at some point, not that the defendant wasn't brandishing it just as [the witness] said he was); *Lieberman v. Washington*, 128 F.3d 1085, 1093 (7th Cir. 1997) (agreeing with trial court that fingerprints lifted from the rape scene were not material even though none of the prints belonged to the defendant, given the overwhelming evidence of the defendant's guilt). As a result, the Court cannot conclude that the inference proffered by Mr. Cornelius carries so much weight that it would have contributed to a different verdict. *See United States v. Villasenor*, 664 F.3d 673, 683 (7th Cir. 2011) ("Suppressed evidence is not material unless there is a reasonable probability that the suppressed evidence would have produced a different verdict.") (quotation marks and citations omitted).

In addition, when Ms. Klosinski's report is considered in the context of the entire record, its lack of materiality is that much more evident. The report does not indicate when the latent print was deposited, and substantial evidence points to Mr. Cornelius possessing the firearm on

June 27, 2021, for a sustained period of time. Officer Payne testified at trial that he saw Mr. Cornelius walk from behind a house with a rifle in hand and ordered him to drop it. Mr. Cornelius complied and immediately said, "I have a license." He added that this was "a child dispute," and reassured the officer that "you good, you good, bro," as well as "it is nothing, I promise; Y'all good." A jury could reasonably conclude that the claim that Mr. Cornelius had "a license" was meant to convey his legal authorization to possess the rifle, and not merely that he had a means of personal identification. When a different officer began clearing the shells from the rifle, Mr. Cornelius urged him not to do that because "that's $40 a round." A jury could reasonably conclude that his protest was evidence of his ownership. And Mr. Cornelius said nothing about someone holding a gun to his head or wrestling the gun away from another person. Mr. Miller likewise said nothing about it, even as Mr. Cornelius was being arrested. Again, a jury could reasonably conclude that this information would have been shared with police, especially when it became evident that Mr. Cornelius was to be arrested for possession of the rifle. Based on the Court's observation of the trial evidence, the Government's failure to produce Ms. Klosinski's report would not likely have changed the result of the trial nor did it undermine confidence in the outcome of the trial. Accordingly, the Court will deny Mr. Cornelius's motion under *Brady*.

### (2) *Mr. Cornelius's Motion under Rule 33*

In the alternative, Mr. Cornelius has moved for a new trial under Rule 33 on the grounds of newly discovered evidence, namely, Ms. Klosinski's forensic report. This motion must be denied for the same reasons as the motion under *Brady*. By proffering an inconclusive report, Mr. Cornelius has not shown that his substantial rights have been jeopardized by errors or

omissions during trial. *See United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989) ("Courts have interpreted Rule 33 to require a new trial 'in the interest of justice' in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial."). This is not an extreme case for which a grant of a new trial is reserved. *See Peterson*, 823 F.3d at 1122 (granting a motion for a new trial "is reserved for only the most extreme cases"). The Government's witnesses were credible and testified consistently with each other and with the video recordings. And Mr. Cornelius's own statements, as captured by police recordings, provide  substantial inference of his ownership of the rifle, even if he suggests they were made under the influence of alcohol. On the other hand, while the testimony of Mr. Cornelius and Mr. Miller aligned with each other, it was inconsistent with the video evidence as to the nature of possession of the rifle. Nor did it satisfactorily explain why the information about the purported self-defense was not provided to the police upon their arrival. Given these discrepancies, and the close personal relationship between Mr. Cornelius and Mr. Miller, the Court recognizes the potential credibility concerns attached to their testimony. *See United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999) (in considering a motion for a new trial, "a court may properly consider the credibility of the witnesses"). Therefore, the verdict against Mr. Cornelius on Count 2 of the superseding indictment is not so contrary to the weight of the evidence that a new trial is required in the interest of justice. The Government's failure to provide Mr. Cornelius with Ms. Klosinski's report did not deprive him of a fair trial, and his motion under Rule 33 must be denied as well.

**D.  Conclusion**

For these reasons, the Court DENIES Mr. Cornelius's motion for a new trial (DE 111).


SO ORDERED.

ENTERED: August 19, 2024

_____/s/ JON E. DEGUILIO_____
Judge
United States District Court