UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case No. 3:21-CR-90 JD |
| LEONTIS CORNELIUS | |

## OPINION AND ORDER

Defendant Leontis[1] Cornelius was convicted by a jury of two counts of possessing a firearm after previously being convicted of a felony offense, in violation of 18 U.S.C. § 922(g)(1). (DE 67.) Since then, the Court has received and ruled on multiple post-trial motions and requests for deadline extensions. Ahead of the sentencing hearing, Mr. Cornelius's previous counsel, Scott Frankel, filed multiple objections to the Presentence Report. (*See* DE 114.) Upon Mr. Frankel becoming a magistrate judge in this district, William Stevens was appointed to represent Mr. Cornelius.

On August 20, 2024, the Court ordered Mr. Stevens to file a status report indicating whether Mr. Cornelius maintains prior counsel's objections to the Presentence Report, has any new objections, or both. (DE 145.) Mr. Stevens has done so, but inadvertently directed his objections to a draft PSR (DE 100) instead of the final PSR (DE 113). Mr. Stevens did not learn about the mix-up until the Government responded and lodged one objection of its own. (DE 152.) In his reply, Mr. Stevens revised and finalized Mr. Cornelius's objections. For the reasons below, the Court sustains in-part and overrules in-part Mr. Cornelius's objections; and sustains the Government's sole objection.

---

[1] At trial, Mr. Cornelius testified that his name is spelled Leonitis. (Tr. Vol. 2 at 332.) In this Order, the Court uses the spelling as it appears in the Superseding Indictment.

### A. Procedural Background and Trial Evidence

**(1)** *Superseding Indictment*

Mr. Cornelius was charged in a Superseding Indictment with two counts of possessing a firearm as a felon (in May 2020 and June 2021). (DE 15.) The Superseding Indictment also alleged an enhanced penalty under the Armed Career Criminal Act ("ACCA") on the grounds that Mr. Cornelius committed three prior qualifying felony convictions "on occasions different from one another," as stated in 18 U.S.C. § 924(e)(1). (*Id.* at 3.) In pretrial proceedings, consistent with the then-governing Seventh Circuit's precedent, the Court, over the objection of the Government, reserved for itself the question of Mr. Cornelius's ACCA eligibility—specifically, whether his prior convictions were committed on occasions different from one another—for sentencing proceedings. (DE 46.); *cf. United States v. Hatley*, 61 F.4th 536 (7th Cir. 2023) (holding that district judges may make the occasions finding even after the Supreme Court's decision in *Wooden v. United States*, 142 S. Ct. 1063 (2022)). As a result, this question was not submitted to the jury.

**(2)** *Trial Evidence*

The following factual evidence was presented at trial:

On May 13, 2020, just before midnight, South Bend Police responded to a Shot Spotter alert on Elmer Street. (Trial Tr. Vol. 1 at 156.) Mr. Cornelius was outside with members of his family and guests when a car pulled up and its occupants started shooting toward the group. Mr. Cornelius fired back with a Smith & Wesson pistol. One of the responding officers was Sgt. Paul Daley who spoke with Mr. Cornelius and wrote a police report. When Sgt. Daley arrived, Mr.

Cornelius was still holding the pistol. (*Id.* at 157.) Detective Bruno Martinsky found out about the shooting several days later after receiving Sgt. Daley's report. On May 19, 2020, Detective Martinsky called Mr. Cornelius about the shooting and confirmed that he had used the gun the week prior and still had the gun. (*Id.* at 142–147.) Detective Martinsky then arranged for a meeting at Mr. Cornelius's residence so he could pick up the gun. When he arrived, Mr. Cornelius handed over a retail package with a Smith & Wesson pistol inside. (*Id.* at 158.)

About a year later, around 2 a.m. on June 27, 2021, South Bend Police Officer Garrett Payne was called to a house on Huey Street regarding a disturbance. (Trial Tr. Vol. 1 at 163–164.) When Officer Payne arrived, he found Mr. Cornelius walking from behind a house toward the front yard and carrying a rifle. (*Id.* at 166.) Officer Payne asked him, "What's going on?" and, upon seeing the gun, yelled, "drop it, drop it, drop it." (*Id.* at 166–69, Gov't Ex.1, Payne's Body Camera Video at 0:20–30.) Mr. Cornelius dropped the weapon and responded, "I've got a license. I've got a license." (Trial Tr. Vol. 1 at 166–167, 170, 181; Gov't Ex. 1, Body Camera Video at 0:30–3). Mr. Cornelius also told Officer Payne that no one else was in the house, he did not live there, there were no other guns in the home, and that this was a "child dispute." (Trial Tr. Vol. 1 at 167–168; Gov't Ex. 1, Body Camera Video at 0:40-1:02; 1:25-30.) A moment later, Mr. Cornelius continued: "You good, you good, bro" (Gov't Ex. 1, Body Camera Video at 1:10-17), and "[i]t is nothing, I promise you. Y'all good" (*id.* at 1:30-40).

Officer Payne told another responding officer, Shawn Fredenburg, to retrieve the rifle lying on the ground. (Trial Tr. Vol. 1 at 180–181; Gov't Ex. 2, Fredenburg body camera video.) Officer Fredenburg picked up the rifle and started clearing it to unload the ammunition. Seeing this, Mr. Cornelius exclaimed, "Please don't do that. Don't do that. That's $40 a round. Don't do that. That's $40 a round." (Trial Tr. Vol 1 at 188; Gov't Ex. 2, Fredenburg body camera video at

0:35-42.) In his interactions with the two officers, Mr. Cornelius said nothing about "somebody holding a gun to his head" or about him "wrestling the gun away from another person." (*Id.* at 176.)

During his case-in-chief, Mr. Cornelius offered, through his own testimony and the testimony of Corey Miller, the affirmative defenses of self-defense and public authority. As to the first incident, Mr. Cornelius testified that on May 13, 2020, he was grilling outside of his home, celebrating his sister-in-law's birthday. His brothers, who had recently been released from prison, were also there. (Trial Tr. Vol. 2 at 340.) According to Mr. Cornelius, his wife gave the sister-in-law a .45-caliber handgun as a birthday present. (*Id.* at 340–41.) Mr. Cornelius did not know when and where the gun was purchased and whether it was presented in a wrapped box. (*Id.* at 374–75.) At some point, an unfamiliar car drove by, circled back, and the occupants opened fire. (*Id.* at 341–43.) The assailants got out of the car and said, "let's get out and walk them down," which Mr. Cornelius knew was slang for, "let's go up and shoot them in the head." (*Id.* 344–45.) Sheltered behind a car, Mr. Cornelius looked for something he could use to defend himself and saw his sister-in-law's purse with the gun box hanging out. He grabbed the gun and tried to shoot but nothing happened. (*Id.* at 345.) He then racked it, stood up, and fired at the shooters, who fled in the car. (*Id.* at 345–46.)

On cross-examination, Mr. Cornelius did not deny that, in his statements to authorities, he omitted any mention of the assailants getting out of the car or grabbing his sister-in-law's gun; instead, he testified that he told them "everything that [he] felt was relevant." (*Id.* at 377.) According to Mr. Cornelius, when Detective Martinsky tried to retrieve the gun six days later, he had to call his sister-in-law to get it back. His sister-in-law brought the gun over, and he gave it to Detective Martinsky. (*Id.* at 352.)

4

As to the second incident, Mr. Cornelius called his friend, Corey Miller, to testify. Mr. Miller said he was with Mr. Cornelius on the night of June 27, 2021, when Mr. Cornelius told him that they should continue their partying elsewhere. (*Id.* at 299–300.) Mr. Miller's girlfriend was also with them and she had to visit or pick up her daughter at a house on Huey Street. As a result, Mr. Miller, his girlfriend, and Mr. Cornelius drove to Huey Street. (*Id.* at 300–301.) When they got there, Mr. Miller and his girlfriend got out of the vehicle and an argument ensued between them and the father of the girlfriend's daughter. (*Id.* at 306.) Hearing the argument, Mr. Cornelius joined the group, and at this moment another man with a rifle came from around the house. The man stood three feet away from Mr. Miller and Mr. Cornelius and pointed the rifle to their heads. Mr. Cornelius snatched the rifle out of the man's hands and the man ran away behind the house. (*Id.* at 307–309.) Mr. Miller testified that Mr. Cornelius dropped the rifle "as soon as he snatched it" and just as the police pulled up. (*Id.* at 328.) When police arrived, Mr. Miller did not tell them about the man holding a gun to their heads. (*Id.* at 322.)

Mr. Cornelius's testimony was similar to that of Mr. Miller. Mr. Cornelius said he was celebrating an award of contracts from the City of South Bend and his upcoming birthday. (*Id.* at 357–58.) He wanted to continue celebrating with his longtime friend, Mr. Miller. (*Id.* at 358–359, 385.) Once arriving at Huey Street, he got out of the car upon hearing the commotion, when a man appeared and pointed a gun at his head. Mr. Cornelius instinctively grabbed the gun and the man ran away. (*Id.* at 360–362.) Mr. Cornelius went looking for the man and dropped the firearm behind the house before the officers showed up. (*Id.* at 363.) In response to the testimony of South Bend officers, Mr. Cornelius said his comment about having a license "was me saying that, as like, I can identify who I am." (*Id.* at 364, 392.) He also said that it did not make sense for him to comment on the price of the bullets because "there's no way that you going to find a

5

round that cost $40." (*Id.* at 364.) He blamed his drunken state for the statements heard on the bodycam videos claiming that the individual in the video recordings is "a drunk version of me." (*Id.* at 393–94.)

The jury found Mr. Cornelius guilty on both counts of the Superseding Indictment. Consistent with the pretrial rulings, the jury did not decide whether Mr. Cornelius predicate offenses under ACCA were committed on occasions different from one another.

### (3)  *Post-Trial Developments and Briefing*

On June 21, 2024, the United States Supreme Court decided *Erlinger v. United States*, 144 S. Ct. 1840 (2024), holding that a jury must make the "separate occasions" determination. As a result, the Court ordered the parties to confer to determine whether they could agree on a course of action regarding the occasions finding in light of *Erlinger*.

On September 26, 2024, the parties filed a joint notice indicating that they don't agree whether Mr. Cornelius's prior convictions occurred on different occasions: the government believes that they did, but Mr. Cornelius declines to concede the point. (DE 147 at 2.) The parties agree, though, that *Erlinger* precludes the Court from imposing the enhanced penalties in 18 U.S.C. § 924(e)'s penalty provisions absent a jury finding. They submit that it would constitute double jeopardy to convene a second jury to resolve only the different occasions question.

Subsequently, Mr. Cornelius filed a series of objections that were inadvertently directed at a draft PSR (DE 100). After realizing the mistake, Mr. Cornelius's counsel revised the objections (DE 158), and they are now ready for the Court's ruling.

### B.  Discussion

**(1) *ACCA***

In paragraphs 29, 41, 43, 60, and 110–112, the PSR relies on the ACCA in determining the Guidelines sentence. The parties agree that in light of *Erlinger*, 144 S. Ct. 1840, all references in the PSR to the ACCA should be removed because the jury did not make a "separate occasions" finding about Mr. Cornelius's prior offenses. The Court agrees and will direct the probation office to amend the PSR accordingly.

**(2) *U.S.S.G. § 2K2.1(b)(6)(B)***

Mr. Cornelius objects to paragraph 17 of the PSR which proposes to add four levels to his base offense level under § 2K2.1(b)(6)(B) for possessing a firearm "in connection with another felony offense," that is, "Criminal Recklessness (shooting back at the vehicle while it drove away in a residential area)" (PSR, DE 113 ¶ 17). He argues that he committed no such offense because he shot at the car in self-defense after first being attacked by its occupants.

"Possessing a gun as a felon 'in connection with another felony offense' triggers a four-offense-level increase if the government proves by a preponderance of the evidence (1) that the other felony occurred and (2) a gun 'facilitated, or had the potential of facilitating,' the other felony. *United States v. Flanagan*, No. 21-2972, 2022 U.S. App. LEXIS 28998, at *4 (7th Cir. Oct. 19, 2022) (citing U.S.S.G. § 2K2.1(b)(6)(B) & cmt. n.14(A); *United States v. Sandidge*, 784 F.3d 1055, 1062 (7th Cir. 2015)); *see also United States v. Hancock*, 103 F.4th 1261, 1265–66 (7th Cir. 2024) ("To apply § 2K2.1(b)(6)(B), the government must prove by a preponderance of the evidence that [the defendant] 'used or possessed' a firearm 'in connection with another felony offense.'"). The enhancement applies "even if the defendant was neither charged for nor convicted of the second crime." *United States v. Ingram*, 40 F.4th 791, 794 (7th Cir. 2022).

According to Indiana Code § 35-42-2-2, a person is guilty of felony criminal recklessness if he "recklessly, knowingly, or intentionally performs an act that creates a substantial risk of bodily injury to another person . . . while armed with a deadly weapon." Ind. Code § 35-42-2-2(a)-(b)(1)(A). However, a person in Indiana may use deadly force and does not have a duty to retreat "if the person reasonably believes that that force is necessary to prevent serious bodily injury to the person or a third person or the commission of a forcible felony." Ind. Code § 35-41-3-2(c). "For a claim of self-defense to prevail, the defendant must show that he (1) was in a place where he had a right to be; (2) did not provoke, instigate, or participate willingly in the violence; and (3) had a reasonable fear of death or great bodily harm." *McEwen v. State*, 695 N.E.2d 79, 90 (Ind. 1998). The amount of force that an individual may use to protect himself or herself must be proportionate to the urgency of the situation. *Hollowell v. State*, 707 N.E.2d 1014, 1021 (Ind. Ct. App. 1999). "When a person uses more force than is reasonably necessary under the circumstances, the right of self-defense is extinguished." *Sawyer v. State*, No. 24A-CR-1213, 2024 Ind. App. Unpub. LEXIS 1444, at *5 (Ct. App. Nov. 6, 2024). Also, once the risk of serious injury or death from the assailant ceases, a person does not act in self-defense when attacking the original assailant. *Wilson v. State*, 770 N.E.2d 799, 801 (Ind. 2002) (a defendant could not have been laboring under a reasonable fear of death or great bodily harm after the initial aggressor "had ceased firing and the car was attempting to leave the area"). "When self-defense is raised and finds support in the evidence, the State has the burden of negating at least one of the necessary elements." *Id.*

The Government argues that there is sufficient evidence that Mr. Cornelius possessed the Smith & Wesson pistol on May 13, 2020, in connection with felony criminal recklessness. The Court agrees. Mr. Cornelius testified that, late at night, he was having a party outside of his

8

house with his brothers who had recently been released from prison and celebrating his sister-in-law's birthday, when an SUV pulled up and its occupants started shooting at them. (Tr. Vol. 1 at 341–343.) Everyone fell to the ground seeking protection, including Mr. Cornelius, who ducked behind a parked car. He then saw the assailants getting out of the car, at which point he stood up and started firing back at them. By his own testimony, he kept firing at the car even as the assailants sped off:

> When I stood up I started firing. They were still trying to fire. The guy in the back seat jumped all the way back in the car and closed the door. The guy that was driving — I hit the windshield. *He jumped in the car, and then they sped off. And then I — when I kept squeezing the gun until — it only fired a few brief moments, and they were — they drove off fast*.

(*Id*. at 346 (emphasis added).)

He confirmed this account on cross-examination:

> Q. Well, when you spoke with Officer — Officer Daley was one of the last officers to leave this scene, right?
>
> A. Yes.
>
> Q. And as he was getting ready to leave the scene, you told him that you fired a shot from the .45 into the windshield of the car that drove by your house, right?
>
> A. That is correct.
>
> Q. And then you told him that you unloaded another round into the back windshield, or the back window, as it was driving away?
>
> A. I never told him I unloaded anything.
>
> Q. You told him that you shot into the back window and shattered that as well, right?
>
> A. That's what I said.

(*Id.* at 377–78.)

Finally, during an exchange with the Government's counsel, Mr. Cornelius admitted that he shot out the assailants' car's windows as it was driving away:

> Q. And when you handed this gun over to Sergeant Daley, you told him that you have a pretty accurate shot when it comes to guns, didn't you?
>
> A. He asked me.
>
> Q. And you confirmed, yes?
>
> A. More just saying whatever he wanted — I didn't understand why he asked me that or why I said that. I just agreed.
>
> Q. But you agreed, right?
>
> A. To be a pretty accurate shot, if I was pretty accurate shot, the people — not being funny or anything, but I would have hit something. I didn't hit no one.
>
> Q. Sure. You hit the back window of the car as it was driving away, right?
>
> A. That's what I thought.

(*Id*. at 380.)

Mr. Cornelius's own account, therefore, establishes that he continued shooting—repeatedly—the Smith & Wesson pistol after the assailants stopped attacking and were speeding off. At that point, Mr. Cornelius was no longer defending himself as the danger of bodily injury or death to himself and his guests had ceased. *See Wilson*, 770 N.E.2d at 801 ("Further, even assuming for the sake of argument that [the defendant] was not the initial aggressor and was only 'returning fire,' the record shows he continued shooting after [the assailant] had ceased firing and the car was attempting to leave the area. At that point, [the defendant] could not have been laboring under a reasonable fear of death or great bodily harm."); *See Hollowell v. State*, 707 N.E.2d 1014, 1021 (Ind. Ct. App. 1999) (finding sufficient evidence to rebut self-defense claim when the defendant stabbed and continued to pursue initial aggressor with a knife after initial aggressor retreated); *Jackson v. State*, 267 Ind. 501, 503, 371 N.E.2d 698, 699 (Ind. 1978) ("In

10

the case at bar the evidence does show that Stone slapped and choked the [defendant] while they were still in the automobile. However when the parties left the automobile Stone was actually attempting to flee from the [defendant] as she chased him around the car firing the gun at him. Under these circumstances the jury was justified in finding that there was no self-defense and that the appellant had become the aggressor in the altercation."). Moreover, the fact that Mr. Cornelius fired at the car speeding away several times undercuts his claim of self-defense. *See Hill v. State*, 532 N.E.2d 1153, 1153 (Ind. 1989) ("Additionally, Defendant shot McEwan three times, and 'we have previously held that the firing of multiple shots undercuts a claim of self-defense.'") (quoting *Miller v. State*, 720 N.E.2d 696, 700 (Ind. 1999)). In short, even if Mr. Cornelius acted in self-defense initially, by continuing to shoot at the fleeing vehicle, with several occupants inside, in a residential neighborhood, he used the Smith & Wesson pistol in connection with another felony offense (criminal recklessness), as he recklessly, knowingly, or intentionally performed an act that created "a substantial risk of bodily injury to another person." Ind. Code § 35-42-2-2(a)-(b)(1)(A). As a result, paragraph 17 of the PSR appropriately increases Mr. Cornelius's base offense level by 4 levels in accordance with § 2K2.1(b)(6)(B).

### (3) *U.S.S.G. § 3C1.1*

Mr. Cornelius next objects to paragraph 17, 18, 22, and 28 of the PSR because it increases his offense level by 2 levels under § 3C1.1 for obstruction of the administration of justice, that is, lying during his testimony at trial. He submits that he testified truthfully: he admitted possessing both the Smith & Wesson pistol in May 2021 and the AR-style rifle in June 2022 which, according to him, are "core material fact[s]." (Def.s Rep. Br., DE 158 at 4.) He states that "[i]n light of [his] admission that he had or exercised dominion over the guns, it is

11

difficult to see how his testimony willfully obstructed a finding that he possessed the firearms." (*Id*. at 5.) However, he ignores the importance of his self-defense claim and how that influences the application of this enhancement.

"The sentencing guidelines authorize [an enhancement under § 3C1.1] if the defendant 'willfully obstructed or impeded, or attempted to obstruct or impede' the investigation or prosecution of the offense of conviction and 'the obstructive conduct related to . . . the . . . offense of conviction . . . .'" *United States v. Chychula*, 757 F.3d 615, 619 (7th Cir. 2014) (citing U.S.S.G. § 3C1.1). "A finding that the defendant committed perjury supports this enhancement." *United States v. Riney*, 742 F.3d 785, 790 (7th Cir. 2014) (citing *United States v. Dunnigan*, 507 U.S. 87, 94 (1993) and U.S.S.G. § 3C1.1, cmt. n.4(B)). "A defendant commits perjury if, while testifying under oath, he 'gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.'" *Id.* (quoting *United States v. Johnson*, 680 F.3d 966, 981 (7th Cir. 2012)).

> We have recognized that a simple denial of culpability cannot serve as the basis of an obstruction of justice enhancement pursuant to § 3C1.1. But when a defendant decides to take the stand and tell the jury a story, he does so at his own risk, for if he commits perjury, the court may, at the time of sentencing, enhance his sentence for obstructing justice.

*United States v. Stenson*, 741 F.3d 827, 831 (7th Cir. 2014) (citations and quotation marks omitted). "To apply the enhancement based on perjury, 'the district court should make a finding as to all the factual predicates necessary for a finding of perjury: false testimony, materiality, and willful intent." *Id.* (citing *United States v. Johnson*, 612 F.3d 889, 893 (7th Cir. 2010)). "For these purposes a matter is 'material' if it concerns information 'that, if believed, would tend to influence or affect the issue under determination.'" *Id.* (citing U.S.S.G. § 3C1.1, App. n.6). "The

12

statement need not actually affect the decision." *United States v. Grigsby*, 692 F.3d 778, 785 (7th Cir. 2012).

The Court finds that Mr. Cornelius perjured his testimony at trial by testifying falsely on a material matter with willful intent, i.e., whether he acted in self-defense. The Government presented evidence that police responded to the Huey Street disturbance on the night of June 27, 2021, and found Mr. Cornelius walking from around the house with a rifle in hand. When he was told to "drop it," Mr. Cornelius replied, "I've got a license." He then said, "It is nothing. I promise you. Y'all good." (Tr. Vol. 1 at 169.) Moments later, he told another officer who was clearing the rifle of ammunition: "Please don't do that. That's $40 a round." (*Id*. at 188.) Mr. Cornelius said nothing about being accosted with a firearm by someone or having to wrestle away the gun. Moreover, during the course of his arrest and the investigation by the responding officers, Mr. Cornelius spoke to and was in the vicinity of at least two officers: Payne (Tr. Vol. 1 at 166–167) and Fredenburg (*id*. at 188). And while the initial encounter with Office Payne took place in somewhat rapid succession, he remained on the sidewalk with the officers for several minutes (Officer Fredenburg testified that he arrived within a couple minutes of Office Payne (*id.* 180); another minute or two passed while Officer Fredenburg located the rifle and cleared out the rounds). So, Mr. Cornelius had plenty of time and opportunity to inform the officers what had purportedly happened before their arrival, especially given the dramatic nature of the narrative he offered at trial. At the very least, having supposedly narrowly escaped what could have resulted in serious injury or death, one would expect Mr. Cornelius to have been eager to report the assailant, if for no other reason than to explain why he, a man with several felony convictions, was found holding a firearm. Yet, instead of telling Officer Payne, "I just had a gun pointed at my head," Mr. Cornelius's response was, "I have a license." (Tr. Vol. 2 at 392.) As

13

this Court previously found, "given what Mr. Cornelius actually did and said, it is reasonable to infer that the rifle belonged to Mr. Cornelius, that is, he brought it with him to Huey Street, despite Mr. Miller's and Mr. Cornelius's testimony to the contrary." (Op. & Order, DE 117 at 18.) At trial, Mr. Cornelius testified that somebody pointed the rifle at him, and he only took it to save his life:

> What happened was when I go — when I pulled — when I walked over there talking to them, I get — you know what I mean — stuff started calming down with the guy. An individual run up, poked me — poked me in the head. Because I'm standing with my back to the back side of Corey talking to him, talking to the — listening to him talk to the other guy. And as soon as the guy come, I grab him. He poke me in the head. When he poked me in the head, I pulled the gun, and it came out his hand.

(Tr. Vol 2 at 360–61.) While Mr. Cornelius's friend, Mr. Miller, also testified similarly, the Court is not persuaded by their accounts. Like Mr. Cornelius, Mr. Miller did not affirmatively communicate to the responding officers that someone had pointed a rifle at him and Mr. Cornelius, even though the assailant was still in the area:

> Q. Mr. Miller, Mr. Frankel asked you about Leo[2] dropping the gun. So as things happened, the person who originally had the gun ran away, right?
>
> A. Correct.
>
> Q. And he was totally gone when police got there?
>
> A. He wasn't totally gone. He was still in the area.
>
> Q. But you didn't tell the police that he was in the area and they can find him?
>
> A. Like I said, once again, I was trying to explain it to the police, but they wasn't trying to hear anything. They was trying to calm the females down for fighting each other.

---

[2] "Leo" is Mr. Cornelius's nickname for Leonitis.

14

(*Id.* at 326.) The Court finds it unlikely that the responding officers were not interested that a man had just pointed an assault rifle at them and was still in the vicinity. Moreover, it's hard to imagine that Mr. Cornelius's longtime friend would not persist in explaining to the police what had just happened given the potential impact on Mr. Cornelius' arrest for illegal possession of a firearm. Finally, Mr. Miller's timeline of when Mr. Cornelius purportedly snatched the gun and dropped it doesn't add up in relation to when Officer Payne arrived. Mr. Miller testified that Mr. Cornelius grabbed the gun and immediately dropped it (*id.* at 326–28), but Officer Payne's testimony, which is corroborated by his bodycam, established that Officer Payne saw Mr. Cornelius walk from around the house with a gun in his hands.

In light of the trial evidence, much of which came through video recordings from the officers at the Huey Street incident, the Court concludes that Mr. Cornelius's testimony was false. The Court observed Mr. Cornelius and heard him testify about what allegedly happened on Huey Street in the early hours of June 27, 2021. The Court was also able to compare his testimony with the accounts of other witnesses. *United States v. Coonce*, 961 F.2d 1268, 1275 (7th Cir. 1992) ("Trial courts have the opportunity to observe witnesses and judge their demeanor, and are therefore in the best position to make such credibility determinations, which they may certainly rely on in deciding whom and what to believe"). The Court believes that Mr. Cornelius' ownership of the rifle—negating his claim that he took the rifle from an assailant—is established by his objection to the officer clearing the rounds of ammunition. Why would he protest if the rifle and ammunition weren't his? As well, having heard the testimony in the context of trial, the Court believes that Mr. Cornelius' claim that he "had a license" was intended to convey

15

that he had a right to possess the rifle. And finally, the fact that Mr. Cornelius failed to convey his claim to officers, despite having conversed with several officers at the scene over an extended period of time, suggests to the Court that his testimony was fabricated to support his claim of self-defense. His testimony was also material, as it went to the heart of Mr. Cornelius's self-defense claim. And it was willful, as Mr. Cornelius was afforded multiple opportunities to clarify his testimony on the stand during direct testimony and cross-examination. This testimony in no way can be construed as the result of confusion, mistake, or faulty memory as Mr. Cornelius was adamant and insistent during the course of his extended testimony. As a result, the Court is convinced that Mr. Cornelius perjured himself, making the two-level enhancement for obstruction of justice appropriate.[3]

### (4) *Government's Objection to the PSR*

The Government objects to paragraph 40 of the PSR because it does not consider the "aggregate quantity" of relevant conduct listed in § 3D1.3(b). According to the Government, when the aggregate relevant conduct is accounted for, Mr. Cornelius's total offense level is 28. In his reply brief, Mr. Cornelius disregards the Government's objection and, having assumed that his objections will be sustained, argues that, after the convictions are grouped under § 3D1.4, his total offense level should be 22.

---

[3] Among other things, Mr. Cornelius's previous counsel objected to paragraphs 56 and 57 of the PSR for having three criminal history points assessed for the residential entry conviction. He also objected on the grounds that two levels weren't subtracted for acceptance of responsibility. Finally, he objected to the information set out in paragraphs 3–16 of the PSR. Mr. Cornelius's revised objections to the PSR (DE 158) do not maintain any of these objections, so the Court considers them to be withdrawn.

The Court agrees with the Government. Mr. Cornelius was convicted of two offenses under 18 U.S.C. § 922(g)(1). The Guideline for this section is found in § 2K2.1. Offenses covered by § 2K2.1 are grouped together. § 3D1.2(d). For counts grouped together under § 3D1.2(d), the offense level is the level corresponding to the "aggregated quantity" of behavior. § 3D1.3(b). The application note states that the offense guideline is "based upon the combined offense behavior taken as a whole."[4] § 3D1.3 app. n.3.

Under § 2K2.1(a)(3), Mr. Cornelius's base offense level is 22 because his offense involved a semiautomatic firearm that is capable of accepting a large capacity magazine and he committed the instant offenses after sustaining one felony conviction of a controlled substance offense. (In particular, the rifle involved in Count 2 of the conviction was loaded with a 40-round capacity magazine, which contained 37 rounds; and Mr. Cornelius has been convicted in this district, in *United States v. Cornelius*, 3:04-CR-81, of possessing with intent to distribute cocaine base in violation of 18 U.S.C. § 841(a)(1).[5]) Four levels are added under § 2K2.1(b)(6)(B) because Mr. Cornelius possessed the Smith & Wesson pistol in connection with another felony offense (Criminal Recklessness). Finally, two levels are added under § 3C1.1 because he willfully obstructed the administration of justice. In sum, Mr. Cornelius's adjusted offense level is 28.

---

[4] The United States Sentencing Commission's website has a flow chart for grouping offenses under § 3D1.2. *See* Grouping Multiple Counts of Conviction, https://perma.cc/M94K-4AZR (last visited January 9, 2025).

[5] "The term 'controlled substance offense' means an offense under federal or state law, punishable by imprisonment for a term exceeding one year, that prohibits the . . . distribution . . . of a controlled substance (or a counterfeit substance) or the possession of a controlled substance (or a counterfeit substance) with intent to . . . distribute . . . ." § 4B1.2(b). Mr. Cornelius's conviction in case 3:04-CR-81 for possessing with intent to distribute cocaine base fits this definition. *Cf. United States v. Liddell*, 492 F.3d 920, 922 (7th Cir. 2007) ("[The defendant] also satisfies the second element [of § 4B1.1(a)] because the offense alleged in Count One—possession with intent to distribute five grams or more of cocaine base in violation of 21 U.S.C. §§ 841 (a)(1) and 841(b)(1)(B)—is a felony controlled substance offense.").

### C. Conclusion

For these reasons, the Court sustains in-part and overrules in-part Mr. Cornelius's objections:

- The Court sustains Mr. Cornelius's objection to paragraphs 29, 41, 43, 60, and 110–112 of the PSR. In light of *Erlinger*, 144 S. Ct. 1840, all references in the PSR to the ACCA must be removed because the jury did not make a "separate occasions" finding about Mr. Cornelius's prior offenses;

- The Court overrules Mr. Cornelius's objection to paragraph 17 of the PSR insofar as he challenges the 4-level increase in his offense level under § 2K2.1(b)(6)(B);

- The Court overrules Mr. Cornelius's objection to paragraphs 17, 18, 22, and 28 of the PSR insofar as he challenges the 2-level increase in his offense for obstruction of administration of justice under § 3C1.1;

- The Court overrules Mr. Cornelius's objection regarding his combined offense level.

- The Court sustains the Government's objection regarding Mr. Cornelius total offense level.

The Court finds that Mr. Cornelius's total offense level is 28 and his Criminal History Category is III. This results in the advisory Sentencing Guidelines range of 97–121 months of imprisonment.

The Court DIRECTS the Probation Department to amend the PSR consistent with this Order.

SO ORDERED.

ENTERED:

/s/ JON E. DEGUILIO
Judge
United States District Court